FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2012 NOV 21  AM 9: 31

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 12-CV-02554-BNB

**GIORGIO DESHAUN RA'SHADD\***

**Plaintiff,**
**V.**

**HILDA SOLIS, SECRETARY, US DEPARTMENT OF LABOR;**
**EARL WALKER, REGIONAL DIRECTOR OWCP, IN HIS OFFICIAL CAPACITY**
**AND PERSONALLY;**
**BRADY WHITE, DISTRICT DIRECTOR, IN HIS OFFICIAL CAPACITY, AND**
**PERSONALLY;**
**CHERI OSTERHOUDT, ASSISTANT DISTRICT DIRECTOR, IN HER OFFICIAL**
**CAPACITY, AND PERSONALLY**
**PAULINE LYNCH, OPERATIONS OFFICER, IN HER OFFICIAL CAPACITY AND**
**PERSONALLY;**
**LYN KIRKHAM, SUPERVISORY CLAIMS EXAMINER, IN HER OFFICIAL**
**CAPACITY AND PERSONALLY;**
**RONNIE SANCHEZ, SUPERVISORY CLAIMS EXAMINER, IN HIS OFFICIAL**
**CAPACITY AND PERSONALLY;**
**AND LYDIA TZAGALOFF, ATTORNEY FOR THE AGENCY, IN HER OFFICIAL**
**CAPACITY, AND PERSONALLY.**

**Defendant(s).**

---

## TITLE VII COMPLAINT

---

## PARTIES

1. Plaintiff Giorgio DeShaun Ra'Shadd is a United States Citizen who currently resides in St.

Petersburg, Florida and has a postal address as follows: Post Office Box 47514, Saint Petersburg,

Florida, 33743.

2.  Defendant Hilda Solis is the Secretary of the US Department of Labor, and may be served by service upon the US Department of Justice, U.S. Attorney John F. Walsh Main Office 1225 17th Street Suite 700, Denver, CO 80202.

3.  Upon information and belief, Earl Walker, Regional Director, OWCP, US Department of Labor is a United States Citizen who currently resides in Dallas Texas, and may be served by service upon the US Department of Justice, U.S. Attorney John F. Walsh Main Office 1225 17th Street Suite 700, Denver, CO 80202.

4.  Defendant Brady White is a United States Citizen who currently resides in Denver Colorado, and is currently employed with the US Department of Veteran affairs, Denver Colorado. and may be served by service upon the US Department of Justice, U.S. Attorney John F. Walsh Main Office 1225 17th Street Suite 700, Denver, CO 80202.

5.  Defendant Cheri Osterhoudt is a United States Citizen who currently resides in Denver, Colorado May be served in her official capacity and may be served by service upon the US Department of Justice, U.S. Attorney John F. Walsh Main Office 1225 17th Street Suite 700, Denver, CO 80202.

6.  Defendant Pauline Lynch is a United States Citizen who currently resides in Denver, Colorado Defendant Lynch works at the following address: U.S. Department of Labor, DEEOIC, Final Adjudication Branch, One Denver Federal Center, Building 53, Room D2212, Denver, Colorado 80202,

and may be served by service upon the US Department of Justice, U.S. Attorney John F. Walsh Main Office 1225 17th Street Suite 700, Denver, CO 80202.

7.   Defendant Lyn Kirkham is a United States Citizen who currently resides in Denver Colorado, and works at US Department of Labor, One Denver Federal Center, Building 53, Room B1501 Denver, Colorado 80225 and may be served by service upon the US Department of Justice, U.S. Attorney John F. Walsh Main Office 1225 17th Street Suite 700, Denver, CO 80202.

8.   Defendant Ronnie Sanchez is a United States Citizen who currently resides in Denver Colorado, and works at the following address: One Denver Federal Center, Building 53, Room B1501, Denver, Colorado 80225 and may be served by service upon the US Department of Justice, U.S. Attorney John F. Walsh Main Office 1225 17th Street Suite 700, Denver, CO 80202.

9. Lydia Tzagaloff is a United States citizen and resides in Denver Colorado, and may be served in her official capacity and may be served by service upon the US Department of Justice, U.S. Attorney John F. Walsh Main Office 1225 17th Street Suite 700, Denver, CO 80202.

## JURISDICTION

10.    Jurisdiction is asserted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. ' 2000e-5; 42 U.S.C. § 1981A(b)(l); Title VII of the Civil Rights Acts of 1991; Section 501 of the Rehabilitation Act of 1973, as amended by the Rehabilitation Act Amendments of 1992 (hereinafter referred to as the "Rehabilitation Act").;29 U.S.C. §§ 791, 794; 28 U.S.C. 451, 1331,

1332, 1337, 1343, 1367 and 1345, pursuant to Section 706(f) (1) and (3) of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII");

11.   Defendant United States Department of Labor is an employer within the meaning of Title VII.

12.   The alleged unlawful employment practices took place at the following location: United States

Department of Labor, Office of Workers compensation, 1999 Broadway Denver Colorado 80202

## ADMINISTRATIVE PROCEDURES

13.   Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission

or other appropriate administrative agency on May 2008 regarding the alleged discriminatory

conduct by Defendant(s).

14.   Plaintiff received from the Equal Employment Opportunity Commission or other appropriate

administrative agency a Notice of Right to Sue the Defendant Agency, and pursued an action

before the EEOC, which terminated September 2012.

## NATURE OF THE CASE

15. Defendant has discriminated against Plaintiff because of the following: (please check all that apply)

| Race | Color | Religion |
|---|---|---|
| _____ | __ | _____ |

| Sex | National Origin |
|---|---|
| _____ | __ |

x     Other (please specify)        Disability discrimination
_____                                                         _____

16. Defendant has discriminated against Plaintiff because of the following: (please check all that apply)

Failure to hire
_____

_____ Failure to promote

x _____ Demotion/discharge from employment

x _____ Other (please specify)     Failure to accommodate disability _____

# FIRST CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
## FAILURE TO ACCOMMODATE
## (AGENCY)

1.      Mr. Ra'Shadd alleges that the Agency failed to accommodate his disability because it refused to provide him with disability accommodation equipment, and because it denied him training.

2.      For the duration of his employment with the Agency, plaintiff's Low vision equipment was never installed because Denver Assistant Director Osterhoudt, informed plaintiff verbally and Denver Assistant Director Osterhoudt informed Supervisory Claims Examiner Ronnie Sanchez by email that it was not the responsibility of the Denver District Office of Workers Compensation to install disability accommodation equipment provided by another organization.

3.      When complainant Ra'Shadd provided the letter requesting disability accommodations dated November 19, 2007, both Cheryl Osterhoudt and Lynn Kirkham were required by DOL policy and regulations to take immediate actions to accommodate the disabilities of plaintiff Ra'Shadd.

4.      Plaintiff Ra'Shadd was never given the disability accommodation of additional time for his work or for the evaluation of his work product by Cheryl Osterhoudt or Lynn Kirkham.

5.      The Agency failed to make reasonable accommodations to his known physical or mental limitations.

6.      He also has presented evidence that he asked Mr. Walker, Mr. Sanchez, Mr. White, Ms. Osterhoudt, Ms. Lynch, and Ms. Kirkham to provide him disability accommodations, and all parties failed to provide accommodations requested, as reflected in the testimony of Regional Director Walker below: WALKER - DIRECT 71

**A You seem to interchange accommodation requests versus reasonable accommodations. We get requests for accommodation all the time, but we don't necessarily accommodate all of those reasonable accommodations.**
A I'm trying not to ask you a question back. I was unaware at the time of your termination, for the duration of your employment with the Denver district office, that you had any real or alleged disabilities.
Q And did any of your subordinate managers in the Denver district office make a determination that my requests were unreasonable, and send that information up to you?
A No.
Q So, did anyone else in the Department of Labor, period, communicate to you in any way, that I; 1) made disability accommodation request; and 2) that they determined they were unreasonable?
A No.

7.     Advanced Sick Leave was granted to plaintiff by District Director Brady White, after consultation with Supervisor Pauline Lynch and plaintiff Ra'Shadd when he first arrived in Denver because his accommodations could not be installed in the training room for his use.

8.     Plaintiff applied for advanced leave, sick leave and leave without pay again in November 2007, December 2007, and again in January 2008, and neither of the requests was acted upon.

9.     The Agency was on notice of complainant's brain injury, TBI, PTSD and epilepsy via the note from Dr. McGory November 2007.

10.     Kirkham did not provide emergency medical care during his seizure at work, or ask Ra'Shadd how he was because she made a determination based upon his long service with the agency that Ra'Shadd was faking a stress claim (pg 188).

11.     Pauline Lynch took Plaintiff to the office of the District Director and explaining to the director the need for disability accommodation equipment for plaintiff and the need to have disability accommodation equipment that plaintiff brought with him installed.

12.     Pauline Lynch informed plaintiff that the basic claims examiner training room was too small for the installation of the disability accommodation equipment, and that disability accommodation equipment could not be installed on the training room

computer because that computer would not be the one he would be using once he was assigned a supervisor upstairs.

13.     This caused undue stress and emotional pain to plaintiff and trigger increased seizures

14.     Section 501 of the Rehabilitation Act requires federal agencies to develop affirmative action programs for the hiring, placement, and advancement of individuals with disabilities. See 29 U.S.C.A. § 791(b) (2005).

15.     It is well established both by the statutory language and Supreme Court decisions interpreting the [Rehabilitation] Act that federal employers have greater duties to accommodate disabled workers under section 501 than the duties owed by federal grantees under section 504 or those owed by employers under the ADA. Woodman v. Runyon, 132 F.3d 1330, 1343 (10th Cir.1997).

16.     Plaintiff is an individual with a disability within the meaning of the Rehabilitation Act.

17.     Plaintiff is "otherwise qualified" for the position, meaning he could perform the essential functions of the job with reasonable accommodation.

18.     Defendant was aware of Plaintiff's disability.

19.     Plaintiff needed an accommodation, meaning a causal relationship existed between the disability and the request for accommodation.

20.     Defendant failed to provide Plaintiff the necessary disability accommodation.

**SECOND CLAIM FOR RELIEF
AND SUPPORTING FACTUAL ALLEGATIONS
VIOLATION OF THE FEDERAL LAW AGAINST
RETROCATIVE PERFORMANCE RATINGS
(CODE OF FEDERAL REGULATIONS TITLE 5 CFR 430.209, CFR)**

21.     Supervisor Kirkham, Assistant District Director Osterhoudt and the Denver District Office conspired to prepare an illegal final rating of Ra'Shadd post termination.

22.     Supervisor Kirkham, Assistant District Director Osterhoudt and the Denver
District Office conspired to not issue Ra'Shadd the performance review, and failed to
issue the alleged performance evaluation to Ra'Shadd with the required reviews and
signatures.

23.     Those required reviews and signatures are indeed required by 5 Code of Federal
Regulations *430.208.*

24.     Federal regulation Title 5, Part 430, section 430.203 defines a performance rating
as follows: Performance rating means the written, or otherwise recorded, appraisal of
performance compared to the performance standard(s) for each critical and non-critical
element on which there has been an opportunity to perform for the minimum period. A
performance rating may include the assignment of a summary level within a pattern (as
specified in §430.208(d)).

25.     Title 5 Code of Federal Regulations section *430.208* prohibits the fraudulent
manufacture of post-termination performance evaluations by federal agencies as follows:
When either a regular appraisal period or an extended appraisal period ends and any
agency-established deadline for providing ratings of record passes or a subsequent rating
of record is issued, an agency shall not Produce or change retroactively a rating of record
that covers that earlier appraisal period

26.     The Agency's own emails indicate that after the termination was effective, the
Regional Director then asked the District Director and Supervisor Kirkham if they have
followed the policies and requirements of law. The answers he received by email were
"no".

27.     The Denver District Office and specifically the Supervisory claims examiner
Kirkham informed the Regional Director that the requirement of a performance
evaluation of the plaintiff was not accomplished.

28.     Assistant District Director Osterhoudt and Supervisor Kirkham attempted to cover
up their violations of federal law, union agreements, and DOL policy by instructing

Kirkham and others to conspire to prepare and conceal from Plaintiff the performance evaluation of the Plaintiff after the fact.

29.     Kirkham and the Agency continued the harassment of plaintiff when Assistant District Director Osterhoudt instructed Kirkham to prepare an unofficial performance evaluation of the plaintiff, to not discuss the evaluation with plaintiff and to not give the evaluation to the complainant. All of these actions evidence a conspiracy between Osterhoudt and Kirkham to violate federal law, and Agency procedures for preparation of the performance evaluation.

30.     The testimony of the Regional Director and the Agency Human Resources Director was that at the time of plaintiff's termination, there was no performance evaluation, official or unofficial in the official performance file of the plaintiff.

31.     Walker testified during the MSPB hearing as follows: MSPB HEARING PG 82

        Q Was a -- was an annual performance evaluation provided to you?
        A No.
        Q Was an interim performance evaluation provided to you?
        A No.
        MSPB HEARING PG 83
        Q That really wasn't what was asked. Do you know, from your knowledge of this
        labor -- national agreement, is an unofficial performance evaluation authorized?
        A It can't be unofficial and authorized. I'm not sure --
        MSPB HEARING PG 84
        BY MR. RA'SHADD:
        Q An official evaluation -- was an official interim or annual performance
        evaluation provided to you, of my performance?
        A No.
        Q Was a document that says "performance evaluation" on the top provided to you,
        that was prepared by Lyn Kirkham?
        A I received no such document.

32.     Human Resource Officer Carmen Gaffney testified that Post termination performance evaluations violate federal law as a prohibited personnel practice.

33.     Human Resource Officer Carmen Gaffney testified that whenever action is to be processed they need to make sure they have all record for the file (pg 18);

34.    Human Resource Officer Carmen Gaffney testified that she is an expert in her field (pg 20);

35.    Human Resource Officer Carmen Gaffney never received a performance evaluation on Ra'Shadd (pg 21);

36.    Human Resource Officer Carmen Gaffney was never given a reason why she was not given the performance evaluation of Ra'Shadd prior to his termination (pg 21);

37.    Human Resource Officer Carmen Gaffney testified that if she had the disability information about Ra'Shadd, she would have given them additional advice (pg 49-50).

38.    Carmen Gaffney's EEOC testimony was that her job encompassed looking over SF50s personnel records helping fill positions (pg 82-83);

39.    Human Resource Officer Carmen Gaffney reviewed all the documents and determined Ra'Shadd had more than 90 days supervision (pg98-99);

40.    Human Resource Officer Carmen Gaffney testified that the notebook she reviewed covered less than 90 days (pg 100);

41.    Human Resource Officer Carmen Gaffney's MSPB testimony was that the office of human resources is custodian of the official personnel file of the Ra'Shadd while he is employed with the Agency (pg 18);

42.    Human Resource Officer Carmen Gaffney testified that All advice she gave on full and fair trial period being required for Ra'Shadd as a probationary employee and that the Agency would lose the case if Ra'Shadd appealed his termination, was truthful advice (pg 104-105);

43.    Human Resource Officer Carmen Gaffney testified that she was never given a performance appraisal on Ra'Shadd (pg 106);

44.    Human Resource Officer Carmen Gaffney testified that she never saw a performance appraisal on Ra'Shadd by Kirkham. (pg 106-107).

45.     Human Resource Officer Carmen Gaffney asked for the performance appraisal of Ra'Shadd, but none was on file (pg 110);

46.     Human Resource Officer Carmen Gaffney had never seen the informal performance management plan before preparing for the MSPB and EEOC hearings. (pg 110);

47.     Since 1989, Human Resource Officer Carmen Gaffney has never seen an informal performance management plan on any other agency employee, except Ra'Shadd. (pg 110);

48.     Human Resource Officer Carmen Gaffney testified that she has no idea what an informal performance plan is (pg 110).

49.     Human Resource Officer Carmen Gaffney testified that Ra'Shadd's name was typed on top of the informal performance plan prepared and submitted by Kirkham (pg 110);

50.     All other performance evaluations Human Resource Officer Carmen Gaffney has seen in her career were signed (pg 111);

51.     Human Resource Officer Carmen Gaffney All other performance evaluations she has seen in her career were signed by the rating official (pg 111);

52.     Human Resource Officer Carmen Gaffney testified that all other performance evaluations she has seen in her career were signed by the reviewing official (pg 111);

53.     Human Resource Officer Carmen Gaffney testified that she saw no employee signature on the Ra'Shadd informal performance management plan (pg 111);

54.     Human Resource Officer Carmen Gaffney testified that she saw no date on the Ra'Shadd performance management plan (pg 111);

55.     Human Resource Officer Carmen Gaffney testified that she saw no rating official name on the Ra'Shadd performance management plan (pg 111-112);

56.     Human Resource Officer Carmen Gaffney testified that she saw no reviewing official name or signature on the performance management plan (pg 111-112);

57.     Human Resource Officer Carmen Gaffney testified that Performance appraisals are put in the employees electronic personnel file (pg 112-113);

58.     Human Resource Officer Carmen Gaffney reviewed Ra'Shadd's OPF and no informal performance management plan 2007 existed in it (pg 113);

59.     Human Resource Officer Carmen Gaffney testified that Performance management regulations do not authorize an informal performance management plan for an employee (pg 114);

60.     Human Resource Officer Carmen Gaffney testified that she never saw the informal performance evaluation on Ra'Shadd (pg 144);

61.     Human Resource Officer Carmen Gaffney testified that the informal performance evaluation performed by Kirkham on complainant Ra'Shadd violates personnel regulations and DOL requirements on appraisal

62.     Lyn Kirkham's sworn  EEOC Affidavit Testimony ("B" Affidavit) was that  and that she prepared an unofficial performance evaluation/interim performance appraisal as a matter of record; and that Complainant's performance appraisal was an unofficial performance evaluation/ Interim performance appraisal and it was not provided to the complainant (pg 191);

63.     Lyn Kirkham's EEOC Hearing Testimony included her assertions that on the 18th Jan 2008, she told Ra'Shadd that he was AWOL, and that he needed to watch it (pg194);

64.     Kirkham talked to her supervisor Sheri Osterhoudt and Osterhoudt told her to prepare an interim appraisal (pg. 178);

65.     Kirkham was not asked to prepare an interim appraisal for anyone but Mr. Ra'Shadd (pg. 180);

66.     Kirkham never served the unofficial performance evaluation/interim appraisal on Ra'Shadd (pg. 184);

67.     Gaffney testified that Ra'Shadd's name was typed on top of the informal performance plan prepared and submitted by Kirkham (pg 110);

68.     Gaffney testified that she saw no employee signature on the Ra'Shadd informal performance management plan (pg 111);

69.     Gaffney testified that Performance appraisals are put in the employees electronic personnel file (pg 112-113);

70.     Gaffney testified that she reviewed Ra'Shadd's OPF and no informal performance management plan 2007 was in it (pg 113);

71.     Gaffney testified that Performance management regulations do not authorize an informal performance management plan for an employee (pg 114);

72.     Gaffney testified that she never saw the informal performance evaluation on Ra'Shadd (pg 144);

73.     The informal performance evaluation performed by Kirkham on complainant Ra'Shadd violates personnel regulations and DOL regs on appraisal

74.     These facts alone, but surely with the testimony of the Regional Director and his Human Resource Officer demonstrate that the performance evaluation was performed post-termination.

75.     Human Resource Officer Carmen Gaffney's MSPB testimony was that the office of human resources is custodian of the official personnel file of the Complainant while he is employed with the Agency (pg 18);

76.     Supervisor Kirkham admitted a conspiracy with Assistant District Director Osterhoudt to perform post-termination performance evaluations on Complainant Ra'Shadd; to intentionally prevent Ra'Shadd from both seeing it and providing his input

on the performance evaluation, as is required by agency procedures, OPM requirements and federal law.

77.     The Pauline Lynch EEOC investigative affidavits and EEOC hearing testimony are replete with false and misleading allegations. These false and misleading allegations support Complainant's theory that these affidavits and motions should have never been filed with this Court.

78.     Had the attorneys read the emails, they would have known that the emails contradicted the false sworn testimony of Lynch on her Affidavit as follows:

EEOC HEARING TESTIMONY

Q.    Now, I will give you a second to look it over. Starting from the bottom of the page, that's an e-mail from Mr. Ronnie Sanchez to Glenn Neri with a carbon to Ms. Osterhoudt and yourself dated October 2nd, 2007, isn't it?
A.    Yes.
Q.    And this says that there -- that Mr. Ra'Shadd is the new claims examiner and has special equipment that he uses for disability that's not fully installed, right?
A.    Yes.
Q.    So you knew at least in October -- on October 2nd or thereabouts of 2007 that Mr. Ra'Shadd had some kind of disability equipment that required some installation?
A.    I was cc'd on this as the chief of ops. At that time, I was traveling on the road, I was traveling, so my e-mails, if I read cc, I really didn't give it much attention, I figured it was being taken care of, and I think I asked Mr. White, and he said it is being taken care of, I was not really involved.
Q.    Okay.  I understand that you weren't really involved but you were notified by this e-mail of the circumstance?
BY MR. LEITNER:
Q.    Is that true, is that a correct statement?
A.    Yes, I received a copy.
Q.    Is that a yes?
A.    Yes.
Q.    And from what you are saying, if somebody had asked you for some input, you wouldn't have had anything to offer?
A.    No, I never had direct supervisory authority over him,
Q.    He wasn't really on your radar at that time?
A.    Not at all, no, not at all.

79.     Operation Officer Pauline lynch EEOC hearing testimony was that District Director White told her he was taking care of Ra'Shadd's disability equipment (pg 193, 199);

80.     Operation Officer Pauline lynch saw his disability equipment start coming in from Florida as early as September 2007 (pg 193-194);

81.     Operation Officer Pauline lynch spoke to District Director Brady White September 20047, I told him Ra'Shadd accommodations were coming in, he said he would take care of it (pg194-195);

82.     Operation Officer Pauline lynch was aware disability equipment was coming in from Florida, and that District Director Brady White told her installation was being taken care of and she need not be involved (pg 196-197-198);

83.     District Director White told her to tell the mail room to take the unopened disability equipment boxes and place them on his desk, her Affidavit question #27 EEOC testimony (pg 197-198);

84.     Operation Officer Pauline lynch was notified by email on October 2, 2007 that Ra'Shadd had special equipment he uses for disability that has not been fully installed (pg 200-201);

85.     The Agency attorney already had the emails from the Agency managers and Operations Officer Lynch.

### THIRD CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### FRAUD UPON THE COURT

86.     Cheryl Osterhoudt's EEOC Testimony was a mix of active perjury, and when faced with documentation in the record, truthful testimony.

87.     Osterhoudt added that she was never involved in conversations with District Director Brady White concerning Complainant's disability accommodations equipment (pg 121).

88.     Assistant District Director Osterhoudt then changed her testimony before the EEOC judge when she admitted that she did in fact receive an email from Supervisory Claims Examiner Ronnie Sanchez concerning special equipment installation of Complainant's disability equipment (pg 122);

89.     Assistant District Director Osterhoudt took no action on the received email because she was cc'd; and because she gets hundreds a day and she didn't handle special equipment, only the operations officer lynch (pg 133).

90.     Assistant District Director Osterhoudt admitted that she received email from Sanchez on not setting up disability equipment from another office (pg 125)

91.     Assistant District Director Osterhoudt does not know if Complainant Ra'Shadd's disability accommodation equipment was ever installed (pg 126).

92.     Assistant District Director Osterhoudt then testified that she admits knowledge that Complainant is disabled; and also admitted that she spoke to Operations Officer Pauline Lynch about Complainant Ra'Shadd's disability accommodation equipment (pg 127-128).

93.     Assistant District Director Osterhoudt testified that she stored Complainant Ra'Shadd's personal and adaptive equipment in her locked office, (pg 128-130), (pg 132-133);

94.     Plaintiff's personal & adaptive equipment was put in her office in the corner behind the conference table and locked. She retired March 2008, (pg 150).

95.     Assistant District Director Osterhoudt testified forcefully that Regional Director Earl Walker made all of the decisions concerning things in the Denver District office, and that Regional Director Walker was "very controlling" (pg 144);

96.     Assistant District Director Osterhoudt also admitted possibly meeting with Operations Officer Pauline Lynch and that she told Lynch she would take care of Complaint Ra'Shadd's disability equipment (pg 147-148).

97.     Assistant District Director Osterhoudt testified that she really never read emails cc'ed to her because she gets hundreds of emails (pg 159-160);

98.     Assistant District Director Osterhoudt never followed up on equipment accommodation requests for complainant which was emailed to her by Supervisory Claims Examiner Ronnie Sanchez (Pg 163-164).

99.    Assistant District Director Osterhoudt admits that Supervisory Claims Examiner Sanchez came to her to talk about Complainant's disability accommodation equipment (pg 127)

100.    Although the Defendants are attorneys, and senior managers in Regional and District offices of the US Department of Labor, the Defendants deceived and defrauded the judicial system and actively and knowingly engaged in Fraud upon the Court by willfully and with malice engaging in a common scheme or plan of perjury before MSPB and EEOC judges, and by engaging in perjured sworn affidavits to EEOC investigators during the EEOC investigative process.

101.    The Defendants fraud upon the Court was directed to the judicial machinery itself in the Ra'Shadd v. Secretary of the US Department of Labor proceeding in the MSPB to defraud the Court, to file fraudulent documents, to make fraudulent representations and to make false statements to the Court

102.    The Defendant Lydia Tzagaloff, as an officer of the Court and member of the Bar corrupted and influenced the court or attempted to defraud the Court so that the judge cannot perform her judicial function and where the judicial machinery and its fair and impartial process cannot function in the usual manner.

103.    It is clear and well-settled law that any attempt to commit "fraud upon the court" vitiates the entire proceeding yet these Defendants knowingly conceived and actively engaged in 3-year illegal scheme in a contingency fee arrangement in child custody matters causing the Plaintiff to expend over $50,000 in numerous proceedings - all with the attempt to defraud the court and harm the plaintiff.

104.    The judicial machinery in the Ra'Shadd v. Secretary of the US Department of Labor in the MSPB proceedings could not function in its usual fashion in quick, fair and impartial due process as a result of the illegal scheme of these Defendants.

105. The judicial machinery in the Ra'Shadd v. Secretary of the US Department of Labor in the EEOC proceedings could not function in its usual fashion in quick, fair and impartial due process as a result of the illegal scheme of these Defendants.

106. The Defendant Lydia Tzagaloff, as an officer of the Court and member of the Bar corrupted and influenced the court or attempted to defraud the Court so that the judge cannot perform her judicial function and where the judicial machinery and its fair and impartial process cannot function in the usual manner.

107. The Plaintiff was required to hire outside legal counsel to break up the common scheme or plan of perjury and the fraud upon the Court

108. As a result of these defendants fraud upon the Court the Plaintiff has suffered irreparable harm and financial damage.

109. Defendant Department of Labor and others unknown to the Plaintiffs intentionally, maliciously, wantonly and in gross and reckless disregard for the Plaintiff's reputation and the reputation of their professional and personal beliefs to do business accordingly as well as the well-being of the Plaintiff, The DOL engaged in extreme and outrageous conduct by using false statements

110. Earl Walker, Regional Director United States Department of Labor submitted false official statements in sworn affidavits, and perjured testimony designed to injure complainant and his case before the EEOC investigator, the MSPB and the EEOC hearing administrative Judges

111. Supervisor Kirkham contradicted her MSPB testimony when during the EEOC hearing she testified that she made the initial assessment and mentioned removal to her supervisor Osterhoudt (pg 185).

112. Kirkham confessed the false official statement and perjury and submitted the following confession and apology the EEOC Administrative Law Judge: "I made the

initial recommendation which I would like to apologize which I would like to apologize to you; in my previous testimony I said I did not make the recommendation" (pg 185).

113.    In prior testimony, Kirkham testified that she never accused Complainant of being AWOL. Yet she contradicted that prior testimony when she testified during the EEOC hearing that "on the 18th Jan 2008, she might have told him he was AWOL, covered and to watch It' (pg194).

114.    Assistant District Director Osterhoudt testified that her sworn EEOC affidavit had a discrepancy and she apologized for it (pg205).

115.    Kirkham's previous testimony was that she never took incomplete work from Complainant's desk to evaluate knowing it was not completed. But during the EEOC hearing, when faced with additional evidence, Kirkham testified as follows: I may have taken incomplete work off his desk to review" (p g 212).

116.    Kirkham later admitted under oath that she had completed some forms to justify removal of the complainant (pg 226).

117.    The 3 years' perversion of civil process of hearings is a fraud upon the Court and fraud upon the Plaintiff in a conspiracy between the Defendants and their attorney.

118.    The Defendant Lydia Tzagaloff corrupted the judicial machinery for a 3 year period in order to win the MSPB and EEOC hearings.

119.    In his MSPB testimony, Sanchez testified that he did not know that Plaintiff was a veteran or that he was disabled. Then on Cross examination Sanchez changed his testimony as follows: SANCHEZ PG 13
    Q Were you aware that I was a vet?
    A Yes.
    Q Okay. And did you and I have occasion to speak about my veteran status, in your office?
    A Yes, I believe we did.
    Q And were you aware also that I was a disabled vet?
    A I do not recall specifically, but thinking back on it Mr. Ra'Shadd, I do recall maybe a conversation you and I had socially where you had mentioned to me, possibly some
    connection there.

Q Now, do you recall me informing you of my request for disability accommodations?
A No, I do not.

Q And do you remember speaking to me in the hallway about getting my Jody Low    Vision disability accommodation device properly installed?
A I do not recall that.
Q And do you remember telling me that you would contact Denver IT and that they would have it installed in no time?
A I do not recall that.
Q And do you recall sending an email to Lyn Kirkham, Glen Neri, and additional individuals, indicating to them that there was a Jody Low Vision disability accommodation device that
Giorgio Ra'Shadd uses for his disability, that was supplied but not installed?
A I do not recall that.
Q Okay. And do you remember taking any other action, any actions, excuse me. Do you remember taking any action by email or other to attempt to secure my disability accommodations?
A I do not recall.
Q Do you recall telling me that my disability equipment wasn't installed because the office of Worker's Compensation has decided that it wasn't their responsibility to do so?
A I do not recall that.
Q Do you recall submitting an email to Lyn Kirkham indicating that the reason my disability accommodation

equipment wasn't installed, was because the office of Worker's Compensation had decided it wasn't their job to do so?
A I do not recall that.
Q Okay. During the period of time that you and I were working in Unit B, do you recall   me having an occasion to tell you that I had a mandatory appointment at the V.A. due to          my disability?
A I do recall one instance in which you contacted me via telephone to let me know that        you were going to be in late

because you had a V.A. appointment. I do not recall you specifically indicating it was       related to any particular condition.
Q Do you recall ever authorizing leave for V.A. visits by me?
A For that same instance that I just mentioned, yes, I do recall that.

MSPB HEARING
SANCHEZ PG 19-20
Q Okay. Do you recall providing an affidavit to the equal opportunity commission?
A Yes.
Q Regarding a complaint I filed therein?
A Yes, I do.
Q Hold on for a second. Did you provide that affidavit of your own free will?
A Yes. After it was specifically requested, of course.
Q So -- I'm sorry. So -- but you still consider that of your own free will?
A Oh, yes.
Q Okay.
A Yes.

BY MR. RA'SHADD:
Q And to the best of your recollection your testimony in that affidavit was truthful?
A Yes.

120.    Sanchez has submitted affidavits to the EEOC that constitute false official statements, has perjured himself before the MSPB and the EEOC, and then admitted in sworn testimony before the EEOC judge that he previously testified incorrectly.

121.    Supervisor Kirkham lied to the Administrative Law Judge about the total leave requested and the total leave forms submitted.

122.    Department of Labor records, and the Decision of the MSPB Judge both demonstrate that Kirkham did not in fact approve any of the leave requests for Ra'Shadd.

123.    EEOC Administrative Law Judge Rosas also detailed in her Initial Decision how the Agency and Kirkham did not in fact approve any of the leave requested by complainant Ra'Shadd.

### FOURTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### FRAUD UPON THE COURT
### (Lyn Kirkham)

124.    Kirkham perjured herself 55 times during the MSPB hearings and again 35 times during the EEOC hearings, then admitted the false prior testimony and apologized to the Honorable Lucila Rosas, Administrative Law Judge of the EEOC for that false prior testimony

125.  Kirkham's prior false testimony was part of a common scheme or plan of perjury by the Agency to negatively impact the civil rights of Plaintiff Ra'Shadd, and is reflected in the MSPB perjured testimony that follows:

> HEARING PG 79, KIRKHAM DIRECT
> Q Okay. And -- so December 2007. And accompanying that performance evaluation that you provided in December 2007, did you provide a recommendation for termination?
> A No, I did not. I simply provided information to my supervisors that I was concerned about Mr. Ra'Shadd's performance.
> Q What was the date that you provided your supervisor, or the district director, or the regional director of recommendation for termination?
> A I did not have the authority to provide a recommendation for termination. I provided the evidence and I expressed my concerns.
> Q So let me rephrase that. Did you ever provide a recommendation for termination of my employment?
> A No.

### FIFTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### FRAUD ON THE COURT
### (Regional Director Earl Walker)

126.  Regional Director Earl Walker's prior false testimony was part of a common scheme or plan of perjury by the Agency to negatively impact the civil rights of Plaintiff Ra'Shadd, and is reflected in the MSPB perjured testimony that follows:

> MSPB HEARING PG 107-108
> Q Now I believe you testified earlier that you were not aware that Mr. Ra'Shadd was a veteran --
> A Correct.
> Q -- when you removed him?
> A Well, I -- I became aware that he had some service in the National Guard just prior to his removal.
> Q And how did you become aware of it?
> A I was provided with a newsletter from some organization that had referred to Mr. Ra'Shadd's experience as an attorney in the National Guard, I believe.
> Q Okay. Were you aware that he had served in the military?
> A I was aware after we'd already made the decision to remove him. I became aware that he had been in the National Guard.
> Q Okay.
> MSPB HEARING PG 110-111
> Q Okay. At the time of Mr. Ra'Shadd's removal you've already testified that you were not aware of his disabilities; is that correct?
> A Correct.

Q Okay. Now in the email chain that we've been discussing, which is at XXX, which we've reviewed, you decided to proceed with the removal despite Ms. Gaffney's comments in that email; is that correct?
A Correct.

### SIXTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### DISPARATE TREATMENT

127.    Kirkham's disparate treatment of Ra'Shadd was part of a common scheme or plan of perjury by the Agency to negatively impact the civil rights of Plaintiff Ra'Shadd, and is reflected in the MSPB testimony that follows:

HEARING PG 73-74
KIRKHAM DIRECT
Q Okay. And was there a time when you gave me an opportunity to provide my written comments to any performance evaluation that you performed on me?
A I had an open door policy and you were welcome at any time to discuss your standards with me.
Q Okay. At any time did you perform a performance evaluation on me?
A Yes, I did.
Q And after you performed a performance evaluation did you provide me the required opportunity to provide written comments?
A The performance appraisal was an informal appraisal.
Q Oh, it was informal. Okay. Hold on.
HEARING PG 76-78
KIRKHAM DIRECT
Q Where did you get the authority to do -- to do an unofficial performance review; what statute, regulation or policy?
A I was following the directions of my supervisor.
Q Okay. What statute, law, or DOL policy gave you the authority to do an official performance evaluation of me?
A I did not have a legal authority such as the Federal Personnel Handbook, I was following the directions of my supervisor.
Q How many performance evaluations have you done over the last year?
A Twelve.
Q And were they because your supervisor told you, or because you knew you had to do them?
A Both.
Q And over this 12 month period that you were just discussing, how many unofficial performance evaluations did you perform on personnel that you supervised?
A Zero.
Q I'll ask that again, only because your answer about five minutes ago indicated one.

A In -- within the last year.
Q Okay.
A To me that means from this date to a year back.
Q So within the last year you did how many?
A Within the last year from this date to may, or from April of 2009 to April of 2008, zero.
Q Okay. Now from November 2007 to January 23rd, 2008, how many did you do?
A One.

128. Kirkham's disparate treatment of Ra'Shadd was part of a common scheme or plan of perjury by the Agency to negatively impact the civil rights of Plaintiff Ra'Shadd, and is reflected in the MSPB testimony that follows:

HEARING PG 84, KIRKHAM DIRECT
Q Okay. Then I'll go back and ask the question. Did you give me ten -- a period not to exceed ten working days with which to examine the material on tentative elements and standards and to respond to you?
A No.

HEARING PG 85
KIRKHAM DIRECT
BY MR. RA'SHADD:
Q Have I ever had a legal appraisal period initiated by you at any time I was under your supervision?
A I performed an interim appraisal.

129. Walker's disparate treatment of Ra'Shadd was part of a common scheme or plan of perjury by the Agency to negatively impact the civil rights of Plaintiff Ra'Shadd, and is reflected in the MSPB testimony that follows:

MSPB HEARING/ WALKER, PG 36-37
A I have an idea of what's going on with regard to performance issues.
Q And do you rely on your subordinates in those offices to sort of give you the feedback so you'll know what's going on?
A When appropriate.

MSPB HEARING PG 49-50
A I was not aware you have a disability, and I'm currently not even aware what that disability might be.
MR. RA'SHADD: Okay. Now, Your Honor, Exhibit A.
A So at the time that I made that decision the information was all performance-based. I had no knowledge of any disability, Or any impact any alleged disability might have on performance.
MSPB HEARING PG 50

Q Okay. What's the date on that document?

A December 7th of '06.

Q Okay. Thank you. Now, this document is from a Department of Labor representative requesting SF15 and 10 point disability veteran's preference documentation be faxed to her. Now after having read this, is it your opinion that the Department of Labor had knowledge of my veteran status and disability as of 2006, the application period?

A I think they were -- again, I don't know the people or the email addresses on the top of that document. I know one of them is a dol.gov, which would indicate, you know, perhaps an address within the Department of Labor.

130.    Walker's disparate treatment of Ra'Shadd was part of a common scheme or plan of perjury by the Agency to negatively impact the civil rights of Plaintiff Ra'Shadd, and is reflected in the MSPB testimony that follows:

MSPB HEARING PG 76

Q At any time, at any time after the date of termination did you communicate with the Denver district office that you wanted additional information regarding the termination?

A After the date of your termination?

Q On January 23rd, or any time after did you communicate to them that you wanted additional information?

A I'm not sure.

Q Do you think it's possible?

A I said, I'm not sure.

Q And I'm asking you a different question, do you think it's possible?

A The day after your removal?

Q On or after, is it possible that you asked them to provide you additional information dealing with this termination; is it possible?

A It's possible.

MSPB HEARING PG 79

A Well, first of all I believe I did receive answers to those questions later in the day. But I think I wanted to be sure that you had really been provided a good opportunity to learn the job. My main concern -- I mean, those were kind of almost peripheral issues. I had already established I think that -- or had been informed that you had a lot of training and
you were failing in every aspect of the job.

Q And so when you sent these emails the decision to terminate had already been made, but you still wanted the information?

A Yeah.

Q Okay.

MSPB HEARING PG 105

Q Did you ever, in the course of Mr. Ra'Shadd's employment with the Agency review any leave without pay requests for him?

A No.

MSPB HEARING PG 116-117
A I wouldn't have issued a directive that said the same thing.
Q So you're answer's no?
A I'm clarifying. You're asking me, did I send out a duplicate document a month a part, I would say no.
Q And so one wouldn't have been issued on November 25th, as well, because you're saying you didn't issue one before December 4th, 2004; is that correct?
A Your question to me, did I issue the same document in November that I re-released in December, I said no.
A I have not personally received any medical information regarding you.
MSPB HEARING PG 122-124
Q -- about --
A -- is more inclusive, but it's not exclusive of veterans.
Q Okay. When did you receive from anyone in the Denver district office my leave without pay request?
A I did not receive your leave without pay request from anyone.
Q Now who in the chain of command had the authority between November 2007 and January 23rd, 2008, to approve a leave without pay request; who has that authority?
A I do. I do.
Q You do?
A Yes.
Q Let me ask it again. Was there anyone in addition to you, with the approval authority for leave without pay requests?
A No.

131.    So every manager in the Regional Director's chain of Command, below him, up through the District Director, and the Assistant district Director, had actual knowledge of the disabilities of Complainant, and the responsibility to transmit that information to their chain of command to the Regional Director.


132.    Supervisor Kirkham was indeed given disability information as early as November 19, 2007. That information was information she had a responsibility to transmit up the chain of command in order to ensure that disability accommodations were installed. EEOC investigative affidavit of Vance Irvin Toole,

Page 2 of 9 questions 4
I was aware that he had a medical condition. I learned it shortly after he came into the class. He told several of the students about having a condition that started when he was in the military. It did not prevent him from performing as a student in the class. I have no medical documentation on his condition. None was given to me and I did not ask for any.

I never saw any accommodation while he was in class. After the class, when he was assigned to his unit, I saw a couple of things on his desk to help magnify the print, but they were never in use when I came by

## SEVENTH CLAIM FOR RELIEF
## NEGLIGENCE OF EARL WALKER
## AND SUPPORTING FACTUAL ALLEGATIONS
### (Failing to and refusing the request of human resource personnel
### To review Plaintiff's OPF prior to authoring his termination)

133.    Plaintiff incorporates the preceding allegations by reference.

134.    Earl Walker owed Plaintiff a duty to refrain from unreasonable conduct which could foreseeably cause damage to Plaintiff's person or property.

135.    Human Resource officer Carmen Gaffney asked, and implored Regional Director Walker to "come view the complete Official Personnel File (OPF) of Plaintiff Ra'Shadd, prior to terminating him. Walker declined and or refused to go view the OPF, and directed subordinates to review the OPF for him instead, as is reflected in emails and EEOC hearing testimony.

136.    Email between Rebecca Houser, Earl Walker and Carmen Gaffney on January 16, 2008, at 339pm, disclosed that Rebecca Houser states that "she reviewed every page of complainant's OPF" *Rebecca Houser notifies Walker and Gaffney that "complainant has military time (is a veteran)". Therefore,* Walker knew at least on January 16, 2008 that Ra'Shadd was a veteran.

137.    EMAIL between Earl Walker, Rebecca Houser and Carmen Gaffney, on January 16, 2008, at 319pm, disclosed that Walker directed that Rebecca Houser review complainant's OPF *"own his behalf".*

*138.*    EMAIL between Carmen Gaffney, Earl Walker and Rebecca Houser, on January 16, 2008, at 1554 hours, disclosed an Invitation for Earl Walker to come to Gaffney's office to review Ra'Shadd's OPF.

139.   EMAIL between Earl Walker, Rebecca Houser and Carmen Gaffney, on January 16, 2008, at 227pm disclosed that Earl Walker directed Gaffney to *"share with him what is in complainant's OPF indicating prior government service and who it is with"*.

*140.*   *On* November 4, 2010, during his EEOC hearing Walker testimony, and in the transcript of hearing at Pg 60, line 18-25, and Pg 61, line 1-5, Walker revealed that the SF50 terminating Ra'Shadd effective January 23, 2008 pursuant to the termination action taken by Walker, was prepared and dated prior to the termination effective date of January 23, 2008, and shows the veteran status and disability status and rating percentage of Ra'Shadd.

141.   On November 4, 2010, during his EEOC hearing Walker testimony, and in the transcript at Pg 48, line 1-25, Walker admits that the OPF contained SF50s showing disability and veteran status of Ra'Shadd, and that Houser stated she had reviewed the entire OPF of Ra'Shadd as directed to do so by Walker.

142.   On November 4, 2010, during his EEOC hearing Walker testimony, and in the transcript Pg 49, line 18-25, Walker admits that Houser stated she had reviewed the entire OPF of complainant as directed to do so by Walker.

143.   On November 4, 2010, during his EEOC hearing Walker testimony, and in the transcript Pg 50, line 14-17, Pg 51, Pg 52, and Walker admits that the SF50s in the OPF show that complainant was given a 10 point veteran preference as a 30% or more disabled veteran.

144.   On November 4, 2010, during his EEOC hearing Walker testimony, and in the transcript Pg 39, line 11-19, Walker testified that the January 16th email to walker from Carmen Gaffney stated that she reviewed complainant's entire official personnel file.

145.   On November 4, 2010, during his EEOC hearing Walker testimony, and in the transcript Pg 40, line 1-13, Walker testified that personnel calls are the expertise of labor relations specialist Carmen Gaffney, and that she looked at complainant's official personnel file.

146.  On November 4, 2010, during his EEOC hearing Walker testimony, and in the transcript Pg 41, line 21-26,

147.  On November 4, 2010, during his EEOC hearing Walker testimony, and in the transcript Pg 42, line1-14, Walker admits that after asking Gaffney for more information, Gaffney requested that he come to her office himself to review complainant's official personnel file himself and that in response he declined to request to come do so.

148.  On November 3, 2010, during his EEOC hearing Walker testimony, and in the transcript PG 158, Walker testified that Kirkham actually terminated complainant because she signed the termination letter.

149.  On November 4, 2010, during his EEOC hearing Walker testimony, and in the transcript Pg 270, Walker admits receiving email notice from Kirkham describing the complainant's seizure and accusing complainant of being AWOL. Walker contradicts his prior testimony that he had no knowledge of the seizure and no knowledge of the allegation of complainant being AWOL.

150.  On November 4, 2010, during his EEOC hearing Walker testimony, and in the transcript Pg 271-272, Walker testified that he always checks his emails regularly.

151.  On November 4, 2010, during his EEOC hearing Walker testimony, and in the transcript Pg 174, line 13-25, Pg 175, line 1-23, Walker was informed of the contents of complainant's OPF after his subordinates reviewed complainant's entire OPF, which contains proof of his disability and veteran status, including multiple SF50 denoting disability and veteran status.

152.  Negligence is reflected in the testimony of Regional Director Walker as follows:
BY MR. LEITNER:

> Q.  Now, did Brady White ever inform you that Mr. Ra'Shadd had disabilities which required accommodations?
> A.  No.
> Q.  Did Ron Sanchez inform you that Mr. Ra'Shadd had disabilities which require accommodations?
> A.  No.
> Q.  Did Lyn Kirkham inform you of that?

A.    No.

Q.    And during the period November 7 -- well, did Cheri Osterhoudt inform you of that?

A.    No.

Q.    And they were subordinate managers in your chain of command during the period November '07 to January '08; is that right?

A.    Yes, yes.

153.    The unreasonable refusal and or failure to review the OPF resulted in the wrongful termination of Plaintiff, who was identified in the OPF as disabled, and as a veteran.

154.    Plaintiff has suffered foreseeable damages as a result of this unreasonable behavior of management.

## EIGHTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
### Negligence Per Se - (Regional Director Earl Walker)

155.    Plaintiff incorporates the preceding allegations by reference.

156.    Those unreasonable actions unreasonable refusal and or failure to review the OPF resulted in the wrongful termination of Plaintiff, who was identified in the OPF as disabled, and as a veteran were per se unreasonable.

157.    Plaintiff has suffered damages as a result of this per se unreasonable

## NINTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
### Negligence (Lyn Kirkham)

158.    Plaintiff incorporates the preceding allegations by reference.

159.    Lyn Kirkham owed Plaintiff a duty to refrain from unreasonable conduct which could foreseeably cause damage to Plaintiff's person or property.

160.    Kirkham's testimony is as follows: KIRKHAM – MSPB/DIRECT 99

Q Given your answer, if I were to tell you that on November 13th, 2007 at 2:33 p.m., Ronnie Sanchez sent you an email:

"Subject: Follow-up. Ra'Shadd's special equipment. Lyn, this was the last information I received in regard to Giorgio's equipment. Sherry mentioned at one time the issue was whether or not OWC was willing to set up all the equipment for Giorgio. Giorgio has not followed up with me since this email."
If I were to tell you that would your answer change?
A I get a hundred emails per day. I don't recall that specific one.
Q Is it part of your --
A And that's an assumption that I would have received the email; sometimes email is lost.
Q Is it part of your responsibility as a supervisor of claims examiner to check your email?
A Yes.
Q Is it part of your responsibility to discuss things like this with other supervisors who email you?
A Yes. But I do not recall that email.

161.    Kirkham ignored an email notice to her of plaintiff's disabilities and need for disability accommodation equipment as follows: October 2, 2007 Email notice from Supervisor Sanchez to Supervisor Kirkham titled "RE: Ra'Shadd special equipment" notifying supervisor Kirkham, assistant district director Cheryl Osterhoudt, operations officer Pauline lynch, and others as follows:

Glenn, Giorgio Ra'Shadd is a new CE and has some special equipment he uses for a disability; installation of the equipment was started but not completed. Do we need to generate a new help ticket for this or can you tell me when this install will be complete?
Thanks,
Ron Sanchez
Supervisory Claims Examiner
Unit B
720-264-3073

162.    Kirkham's negligence is reflected in the testimony of Regional Director Walker as follows: BY MR. LEITNER:

Q.    Now, did Brady White ever inform you that Mr. Ra'Shadd had disabilities which  required accommodations?
A.    No.
Q.    Did Ron Sanchez inform you that Mr. Ra'Shadd had disabilities which

require accommodations?

A.    No.

Q.    Did Lyn Kirkham inform you of that?

A.    No.

Q.    And during the period November 7 -- well, did Cheri Osterhoudt inform you
Of that?

A.    No.

Q.    And they were subordinate managers in your chain of command during the
Period November '07 to January '08; is that right?

A.    Yes, yes.

163.    Plaintiff has suffered foreseeable damages as a result of this unreasonable failure,

omissions and actions by Lyn Kirkham.

**TENTH CLAIM FOR RELIEF**
**AND SUPPORTING FACTUAL ALLEGATIONS**
**NEGLIGENCE PER SE**
**(Brady White)**
**(Failure to ensure installation of disability accommodation equipment)**

164.    Plaintiff incorporates the preceding allegations by reference.

165.    Brady White ignored the following email which gave him additional notice of

disability accommodation equipment which required installation as follows: October 2,

2007 Email notice from Supervisor Sanchez to Supervisor Kirkham titled "RE: Ra'Shadd

special equipment" notifying supervisor Kirkham, assistant district director Cheryl

Osterhoudt, operations officer Pauline lynch, and others as follows:

> Glenn, Giorgio Ra'Shadd is a new CE and has some special equipment he uses
> for a disability; installation of the equipment was started but not completed. Do
> we need to generate a new help ticket for this or can you tell me when this install
> will be complete?
> Thanks,
> Ron Sanchez
> Supervisory Claims Examiner
> Unit B
> 720-264-3073

166.    Those actions of White in ignoring notice of disability accommodation equipment

needing installation were per se unreasonable.

167.    Plaintiff has suffered damages as a result of this per se unreasonable by Director White.

## ELEVENTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
### Negligence (Pauline Lynch)

168.    Plaintiff incorporates the preceding allegations by reference.

169.    In her EEOC investigative affidavit of Operations Officer/Claims Manager Pauline K. Lynch, Page 11 of 15, question 27, Lynch testified as follows: "I have no knowledge of what equipment was necessary to accommodate Mr. Ra'Shadd's impairments. I did note in my job as chief of operations that equipment was sent from Jacksonville, Florida directly to Mr. Ra'Shadd as I had oversight of the contract and mails staff. I had mailroom take those boxes directly to Mr. Ra'Shadd and had no further involvement"

170.    In her EEOC sworn hearing testimony Operations Officer/Claims Manager Pauline K. Lynch, testified as follows:

> Q.    And as I understand what you are saying, that when this stuff started coming in from COAST, Mr. White told you just have them deliver it to his desk?
> A.    And they would take care of that part of it.
> Q.    And that was the end of your involvement with it?
> A.    Yes, absolutely.
> Q.    And did you know that the -- there was -- there was an issue about getting some disability-related special equipment installed for Mr. Ra'Shadd?
> A.    No, not per se, no.
> Q.    What do you mean not per se?
> A.    In the sense that there would be -- I might have heard hearsay that they were having problems with the tech team going up, but I was not directly involved to have any oversight or care, so I really didn't get involved to make it work or not work because it was being taken care of by someone else who was my authority.
> Q.    I am sorry, I didn't mean to interrupt.  Was Mr. White above you in the --
> A.    Yes.
> Q.    -- in the linear hierarchical command structure?
> A.    Yes, definitely, he is a district director.
> Q.    He was your boss?

A.   And he was taking care of things.
Q.   And there was no reason for you to do anything other than to tell the mail room what to do because he told you what to do?
A.   Exactly.

171.   In his EEOC hearing testimony Regional Director Walker testified as follows:

Q.   And if there was a disability issue, you would be relying on people under you to bring it to your attention?
A.   Well, first of all, we would expect the employee to bring it to the attention of their supervisor.
Q.   I am talking about during the process of deciding to fire him, you would expect if that was an issue, that somebody would have mentioned it, would you not?
A.   I would have expected it to be addressed as soon as the disability was discovered or it was brought to their attention, not wait until the time of whether or not to remove somebody to bring it up.

Q.   Is it not true that the people below you in the supervisory managerial chain of -- again, I am going say chain of command for lack of a better term, you understand what I mean by that?
A.   Yes.
Q.   Are they obligated to report up the chain all the way to you about people in their units or under their supervision that are disabled and in need of accommodations?
A.   Well, again, an individual that has a need expresses that to their immediate supervisor, and that immediate supervisor then works with the reasonable accommodation person that happens to be here in Denver.

172.   Pauline Lynch's owed Plaintiff a duty to refrain from unreasonable conduct which could foreseeably cause damage to Plaintiff's person or property.

173.   Pauline Lynch's negligence in having the mailroom take those boxes directly to Mr. Ra'Shadd and having no further involvement to insure installation of the disability accommodation equipment was unreasonable.

174.   Plaintiff has suffered foreseeable damages as a result of this unreasonable by Pauline Lynch's.

## TWELFTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
### Negligence Per Se - (Pauline Lynch)

175.    Plaintiff incorporates the preceding allegations by reference.

176.    Pauline Lynch's actions in failing to read her official emails, some of which informed her of Plaintiff's disabilities and the status of his disability accommodation equipment was unreasonable.

177.    Supervisor Sanchez sent the following email to Lynch notifying her that disability accommodation still had not be installed: October 2, 2007 Email notice from Supervisor Sanchez to Supervisor Kirkham titled "RE: Ra'Shadd special equipment" notifying supervisor Kirkham, assistant district director Cheryl Osterhoudt, operations officer Pauline lynch, and others as follows:

> Glenn, Giorgio Ra'Shadd is a new CE and has some special equipment he uses for a disability; installation of the equipment was started but not completed. Do we need to generate a new help ticket for this or can you tell me when this install will be complete?
> Thanks,
> Ron Sanchez
> Supervisory Claims Examiner
> Unit B
> 720-264-3073

178.    Those unreasonable actions of not reading her emails were per se unreasonable.

179.    Plaintiff has suffered damages as a result of this per se unreasonable actions and inactions by Pauline Lynch.

## THIRTEENTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
### Negligence (District Director Brady White)

180.    Plaintiff incorporates the preceding allegations by reference.

181.    Supervisor Sanchez sent the following email to Brady White as follows: October 2, 2007 Email notice from Supervisor Sanchez to Supervisor Kirkham titled "RE:

Ra'Shadd special equipment" notifying supervisor Kirkham, assistant district director Cheryl Osterhoudt, operations officer Pauline lynch, and others as follows:

> Glenn, Giorgio Ra'Shadd is a new CE and has some special equipment he uses for a disability; installation of the equipment was started but not completed. Do we need to generate a new help ticket for this or can you tell me when this install will be complete?
> Thanks,
> Ron Sanchez
> Supervisory Claims Examiner
> Unit B
> 720-264-3073

182. Operation Officer Pauline lynch's EEOC hearing testimony was that District Director White told her he was taking care of Ra'Shadd's disability equipment (pg 193, 199);

183. Operation Officer Pauline lynch saw his disability equipment start coming in from Florida as early as September 2007 (pg 193-194);

184. Operation Officer Pauline lynch spoke to District Director Brady White September 20047, I told him Ra'Shadd accommodations were coming in, he said he would take care of it (pg194-195);

185. Operation Officer Pauline lynch was aware disability equipment was coming in from Florida, and that District Director Brady White told her installation was being taken care of and she need not be involved (pg 196-197-198);

186. District Director White told her to tell the mail room to take the unopened disability equipment boxes and place them on his desk, her Affidavit question #27 EEOC testimony (pg 197-198);

187. Operation Officer Pauline lynch was notified by email on October 2, 2007 that Ra'Shadd had special equipment he uses for disability that has not been fully installed (pg 200-201);

188. District Director Brady White's negligence is reflected in the testimony of Regional Director Walker as follows: BY MR. LEITNER:

Q.  Now, did Brady White ever inform you that Mr. Ra'Shadd had disabilities which  required accommodations?
A.  No.
Q.  Did Ron Sanchez inform you that Mr. Ra'Shadd had disabilities which require accommodations?
A.  No.
Q.  Did Lyn Kirkham inform you of that?
A.  No.
Q.  And during the period November 7 -- well, did Cheri Osterhoudt inform you of that?
A.  No.
Q.  And they were subordinate managers in your chain of command during the period  November '07 to January '08; is that right?
A.  Yes, yes.

189.  Brady White's owed Plaintiff a duty to refrain from unreasonable conduct, (such as failing to read his official emails, and failing to notify the Regional Director of his needs), which could foreseeably cause damage to Plaintiff's person or property.

190.  Plaintiff holds a property interest in his good name, credit worthiness, and reputation.

191.  Brady White's failing to read his official emails and failing to follow through with installation of plaintiff's disability accommodation equipment was unreasonable.

192.  Plaintiff has suffered foreseeable damages as a result of this unreasonable actions and failures to act by District Director Brady White.

**FOURTEENTH CLAIM FOR RELIEF
AND SUPPORTING FACTUAL ALLEGATIONS
Negligence (Ronnie Sanchez)**

193.  Plaintiff incorporates the preceding allegations by reference.

194.  Sanchez has testified that he asked IT section to connect the Complainant's disability accommodation equipment (pg 131)

195.  Sanchez has testified that he followed up on his request for connection of the equipment (pg 131)

196.	Sanchez has testified that he communicated by email to Kirkham that Ra'Shadd had disability accommodation equipment which had not been fully installed (pg 131-132 exhibit 56);

197.	Sanchez has testified that he talked to Assistant District Director Osterhoudt about Ra'Shadd's disability accommodation equipment (pg 133);

198.	Sanchez has testified that Assistant District Director Osterhoudt told him she was aware of his disability accommodation equipment requirements and she was taking care of it (pg133);

199.	Sanchez has testified that he did not follow up on his conversation with Osterhoudt to ensure Ra'Shadd's equipment was received and installed (pg 133);

200.	Negligence is reflected in the testimony of Regional Director Walker as follows:
BY MR. LEITNER:

>	Q.	Now, did Brady White ever inform you that Mr. Ra'Shadd had disabilities which required accommodations?
>	A.	No.
>	Q.	Did Ron Sanchez inform you that Mr. Ra'Shadd had disabilities which require accommodations?
>	A.	No.
>	Q.	Did Lyn Kirkham inform you of that?
>	A.	No.
>	Q.	And during the period November 7 -- well, did Cheri Osterhoudt inform you of that?
>	A.	No.
>	Q.	And they were subordinate managers in your chain of command during the period November '07 to January '08; is that right?
>	A.	Yes, yes.

201.	For the duration of his employment with the Agency, Complainant's Low vision equipment was never installed because Supervisory Claims Examiner Ronnie Sanchez informed Complainant that it was not the responsibility of the Denver District Office of Workers Compensation to install disability accommodation equipment provided by another organization. This caused undue stress and emotional pain to Complainant and trigger increased seizures.

202.    Ronnie Sanchez owed Plaintiff a duty to refrain from unreasonable conduct which could foreseeably cause damage to Plaintiff's person or property.

203.    Plaintiff holds a property interest in his good name, credit worthiness, and reputation.

204.    Ronnie Sanchez's actions and failures to act were negligent and were unreasonable.

205.    Plaintiff has suffered foreseeable damages as a result of this unreasonable by Ronnie Sanchez.

### FIFTEENTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### Negligence Per Se (Ronnie Sanchez)

206.    Plaintiff incorporates the preceding allegations by reference.

207.    Veterans Administration Hospital Doctor John McGory submitted the following letter to Plaintiff who submitted the letter to Supervisor Sanchez and Supervisor Kirkham:

> November 19, 2007
> RE: Mr. Ra'Shadd
> To Whom it may concern:
> Mr. Ra'Shadd has requested that I inform you about his medical condition. He is being treated for Post-traumatic Stress Disorder and a Seizure Disorder. It would be beneficial for Mr. Ra'Shadd if he was allowed extra time during his examinations and papers.
> Sincerely
> John P. McGory, MD

208.    Plaintiff never received the accommodation of additional time for his work.

209.    Those unreasonable actions of failing to accommodate plaintiff as requested by Dr. McGory, were per se unreasonable.

210.    Plaintiff has suffered damages as a result of this per se unreasonable by Ronnie Sanchez.

## SIXTEENTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
## CONSPIRACY
### (Osterhoudt, Kirkham, White, Sanchez)

211.    Various other individuals not yet presently unknown to Plaintiff participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  (Conspiracy to Commit Fraud) (42 U.S.C. 1983) (42 U.S.C. 1985) (42 U.S.C. 1986)

212.    Conspiracy is sufficiently described as combination of two or more persons, by concerted action, to accomplish criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means.

213.    Kirkham Testified during the EEOC hearing that she was told to perform the post termination performance evaluation by Assistant District Director Osterhoudt and that Osterhoudt told her not to present the performance evaluation to the Plaintiff.

214.    Crime of conspiracy is agreement to commit unlawful act where one party to agreement does any act, even one that itself is not crime to accomplish conspiracy's purpose; in other words, defendants need not have acted jointly to effect agreement or have committed crime that was its object. U.S. v. Duvall, 846 F.2d 966.

215.    The performance of a post-termination performance evaluation on a federal employee violates federal law and Agency regulations and procedures.

216.    The Defendant, Lydia Tzagaloff, an attorney with the Department of Labor, provided assistance for the continuation of the conspiracy to violate the Civil Rights of Mr. Ra'Shadd by committing Rule 11 violations throughout the investigatory EEOC process.

217.    Tzagaloff helped to maintain the lies against Mr. Ra'Shadd. This placed the Defendant with knowledge of the illegal activity from the very beginning.

218.    There was an agreement between two or more individuals (Kirkham and Osterhoudt) to deprive Ra'Shadd of some protected right where Osterhoudt and Kirkham acted in furtherance of objectives of conspiracy, which causes actual injury to a person or property or deprives Ra'Shadd of exercising any right or privilege as United States citizen. 42 U.S.C.A. § 1985. Rios v. Navarro, 766 F.Supp. 1158.

**SEVENTEENTH CLAIM FOR RELIEF
AND SUPPORTING FACTUAL ALLEGATIONS
NEGLIGENT TRAINING OF
(SUPERVISOR LYN KIRKHAM)**

219.    Plaintiff adopts and incorporates herein by reference the allegations made in Paragraphs 1 through 218 above.

220.    The above described actions by the Defendants resulted from the carelessness and negligence of the Defendants in negligently training its agents, servants, employees, or other representatives.

221.    That the actions, inactions, refusals and omissions of the Defendants constitute Negligent Training.

222.    Kirkham testified that she was assigned as a supervisor before being trained in the duties and responsibilities of a supervisor.

223.    Kirkham testified that she only received formal supervisory training a year after Plaintiff was terminated.

224.    Walker testified that he allows personnel to be assigned as supervisors without having been trained in the requirements and duties of a supervisor.

225.    Walker testified that he allowed Kirkham to be assigned as a supervisor despite the knowledge that she had no training as a supervisor.

226.   That as a direct and proximate result of the Negligent Training by Defendants, the Plaintiff has suffered injuries and suffered pecuniary damages in an amount to be proven at the trial of this matter.

### EIGHTEENTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### NEGLIGENT SUPERVISION OF
### (SUPERVISOR LYN KIRKHAM)

227.   In order to show gross negligence of government actors managing subordinates, as would allow imposition of liability in § 1983 action for negligent supervision, Plaintiff shows conscious, voluntary acts or omissions, by the agency, in reckless disregard of a legal duty and of the consequences to another party, or a deliberate indifference to the deprivation of the Plaintiff's Constitutional rights. 42 U.S.C.A. § 1983. Rivers v. O'Brien, 83 F.Supp.2d 328.

228.   Walker allowed an untrained Kirkham to supervise able bodied and disabled employees without any emergency management training and without any supervisory formal training.

229.   The above described actions by the Defendants resulted from the carelessness and negligence of the Defendants in negligently supervising its agents, servants, employees, or other representatives.

230.   Assistant District Director ordered Kirkham to collect and provide Plaintiff with his medication and disability accommodation equipment from his desk after he was terminated, but failed to supervise Kirkham to ensure that she performed as ordered.

231.   Kirkham testified that she declined, refused to and failed to follow the orders of Osterhoudt because she did not have time; she did not feel like doing so; and because Osterhoudt could have ordered someone else to do what she was ordered to do.

232.   The actions, inactions, refusals and omissions of the Defendants constitute
Negligent Supervision

233.   The direct and proximate result of the Negligent Supervision by Defendants, the
Plaintiff has suffered injuries and suffered pecuniary damages in an amount to be proven
at the trial of this matter.

### NINETEENTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### BY ASSISTANT DISTRICT DIRECTOR CHERI OSTERHOUDT

234.   Plaintiff adopts and incorporates herein by reference the allegations made in
Paragraphs 1 through 233 above.

235.   That the following actions, inactions, refusals and omissions of the Defendants
constitute Negligent Infliction of Emotional Distress: Cheri Osterhoudt, Assistant District
Director, US Department of Labor, Denver, Colorado, denied Plaintiff access to his
personal accommodation equipment, army accommodation equipment, and VA hospital
provided accommodation equipment, from January 23, 2008 to the present date, a period
of 4 years.

236.   Osterhoudt hid the disability accommodation equipment of Plaintiff, (which they
retrieved from his desk and drawers), in the office of the Assistant District Director,
Sherri Osterhoudt.

23.   Osterhoudt testified that the equipment and personal effects were placed behind a
table in her desk, her desk was locked.

238.   Osterhoudt, knowing that she had Plaintiff's medication and disability
accommodation equipment locked in her personal office, abruptly retired with
complainant's disability equipment and medications still locked in her office.

239.    Therefore, complainant was denied access to personal accommodation equipment, army accommodation equipment, and VA hospital provided accommodation equipment, from January 23, 2008 to the present date, a period of 4 years.

240.    That as a direct and proximate result of the Negligent Infliction of Emotional Distress by Defendant, the Plaintiff has suffered injuries and suffered pecuniary damages in an amount to be proven at the trial of this matter.

### TWENTIETH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### DEFAMATION BY SLANDER (RONNIE SANCHEZ)
### (False allegation of a claim of prostate cancer)

241.    Plaintiff incorporates the preceding allegations 1- 240 above by reference.

242.    Ronnie Sanchez's publications of false allegations that Plaintiff claimed to him to have prostate cancer was false and defamatory.

243.    In sworn MSPB HEARING testimony, (SANCHEZ PG 25), Supervisor Sanchez testified as follows:

> Q Okay. Now approximately what time did Mr. Ra'Shadd leave your unit?
> A Well, approximately I believe, to the best of my recollection, sometime in November, or likely towards the end of November, because that's when I received my new assignment.
> Q Did you have any interaction with him after he left your unit?
> A Just in passing, in the office.
> Q Do you recall ever discussing any of his health concerns with him?
> A Yes, I do.
> Q And what was the nature of that conversation?
> A One afternoon specifically Mr. Ra'Shadd had shared with me some bad news he had received that he was diagnosed with prostate cancer.

244.    But, Mr. Ra'Shadd informed both the Jacksonville office and the Denver office that he needed to be seated as close as possible to the men's room due to the effect of his medications and the effects of his disabilities, including prostatitis which causes frequent urination.

245.   Jacksonville District Office supervisor Dennis Watts testified in the EEOC hearings as follows:  Ra'Shadd gave Medical notice of VA Appts given supervisor (pg 35); Ra'Shadd requested and was given disability accommodation of being close to restroom due to prostatitis during training (pg 50-51, 52, 53, 54, 56, 57-58); The Agency had knowledge of vet status and VA appointments during work hours (pg 59); and Ra'Shadd Informed co-workers and supervisor of disabilities (pg 90)

246.   Ronnie Sanchez's publications were not privileged communications, and were proven untrue by the testimony of supervisor Watts.

247.   Ronnie Sanchez's publications were made negligently, with reckless disregard to their falsity, or maliciously.

248.   The statements of Ronnie Sanchez were per se defamatory.

249.   Plaintiff has suffered special damages including loss of creditworthiness as a result of the publication of the defamatory statements.

250.   Plaintiff has suffered emotional distress as a result of the publication of the defamatory statements.

**TWENTY-FIRST CLAIM FOR RELIEF
AND SUPPORTING FACTUAL ALLEGATIONS
DEFAMATION BY SLANDER (Brady White)
(False Allegation of claim of prostate cancer)**

251.   Plaintiff incorporates the preceding allegations 1 through 250 above by reference.

252.   Brady White allegations during EEOC testimony that Plaintiff claimed to him to have prostate cancer was false and defamatory.

253.   However, in his sworn EEOC investigative affidavit of District Director Brady White, Page 2 of 15, question 4 and answer, White made no mention of any allegation of prostate cancer as a disability, but noted that plaintiff's disability required disability

accommodation equipment that he knew plaintiff brought from another office with him to Denver as follows:

> Were you aware if the complainant had a medical condition? If so, give the date you became aware of the complainant's medical condition.
> Yes
> Not sure
>
> Page 4 of 15 Question 8
> Did the complainant have any medical restrictions?
> Don't recall
> Did the complainant request any accommodation from you or anyone else? If so, to whom was the request made and when, what accommodation did the complainant request, and what was the response/and or outcome to the request?
> Don't recall exactly. But it seems that he brought something with him from another office

254.    Mr. Ra'Shadd informed both the Jacksonville office and the Denver office that he needed to be seated as close as possible to the men's room due to the effect of his medications and the effects of his disabilities, including prostatitis which causes frequent urination.  See the testimony of Jacksonville District Office Supervisor Dennis Watts below: Dennis Watts EEOC Testimony; Ra'Shadd gave Medical notice of VA Appts given supervisor (pg 35); Ra'Shadd requested and was given disability accommodation of being close to restroom due to prostatitis during training (pg 50-51, 52, 53, 54, 56, 57-58); The Agency had knowledge of vet status and VA appointments during work hours (pg 59); and Ra'Shadd Informed co-workers and supervisor of disabilities (pg 90).

255.    Brady White publications were not privileged communications, and were disproven by the testimony of supervisor Watts.

256.    Brady White publications were made negligently, with reckless disregard to their falsity, or maliciously.

257.    The Brady White allegations were per se defamatory.

258.    Plaintiff has suffered special damages including loss of creditworthiness as a result of the publication of the defamatory statements.

259.    Plaintiff has suffered emotional distress as a result of the publication of the defamatory statements.

**TWENTY SECOND CLAIM FOR RELIEF
AND SUPPORTING FACTUAL ALLEGATIONS
HOSTILE WORK ENVIRONMENT
(Defendant Agency)**

260.    Mr. Ra'Shadd alleges that he was subjected to a hostile work environment because of his disability.

261.    Mr. Ra'Shadd is disabled; was subjected to unwelcome harassment; (3) the harassment was based upon his disability; (4) AND due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of Mr. Ra'Shadd's employment and created an abusive working environment. See Dick v. Phone Directories Co., Inc., 397 F.3d 1256, 1263 (10th Cir.2005).

262.    The work environment was both objectively and subjectively hostile. See Smith v. Northwest Financial Acceptance, Inc., 129 F.3d 1408, 1413 (10th Cir.1997).

263.    A reasonable person would find the work environment was hostile or abusive; and (2) the plaintiff subjectively perceived the environment to be abusive. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

264.    The Agency work environment was objectively hostile or abusive considering the totality of the circumstances, the frequency, severity and context of discriminatory conduct, and the fact that the management actions towards Plaintiff caused him to suffer humiliation,

265.    The Agency work environment was objectively hostile or abusive considering the fact that the conduct unreasonably interfered with a Plaintiff's work performance. Smith, 129 F.3d at 1413. Instead, there must be a steady barrage of such incidents.

266.    The Agency work environment was objectively hostile or abusive considering the fact that the harassment was motivated by Plaintiff's disability. This is evident from the

content of the comments purportedly made by Calvert, Morman, and Kirkham and Hammond.

267.    The Agency work environment was objectively hostile or abusive considering the fact that Mr. Ra'Shadd felt humiliated by Calvert's shouting at him in front of coworkers, Mormon's sarcastic remarks by email, Kirkham's silent treatment and Hammond's teasing when he wore his brain injury helmet. Mr. Ra'Shadd's work performance was negatively affected by all of that conduct during the probationary period. Ra'Shadd was subjected to harassment that was so severe as to alter a term, condition, or privilege of his employment.

268.    The Agency work environment was objectively hostile or abusive considering the fact that Senior Claims Examiner Bea Calvert publically humiliated plaintiff in front of co-workers when she verbally belittled and cursed him concerning his work. Ra'Shadd reported that event to his supervisor Lyn Kirkham.

269.    The Agency work environment was objectively hostile or abusive considering the fact that Supervisor Kirkham humiliated plaintiff when he instituted the "silent treatment" of plaintiff which effectively denied him the benefits of employment with the U. S. Department of Labor.

270.    The Agency work environment was objectively hostile or abusive considering the fact that Kirkham refused to allow plaintiff to go to the VA hospital as he felt a seizure coming on, and instead called an immediate, nonscheduled team meeting.

271.    The Agency work environment was objectively hostile or abusive considering the fact that Kirkham had previously testified that plaintiff never asked her for assistance concerning his work, during her EEOC hearing testimony she testified that she in fact directed him to Senior Claims Examiner Bea Calvert because she was often busy when he asked for assistance and guidance (pg 223).

272.    The Agency work environment was objectively hostile or abusive considering the fact that Kirkham further testified that Calvert was out of office for medical between

November, 2007 and December, 2007 (pg 224), the period of a month during which Kirkham determined that Complainant should be terminated.

273. The Agency work environment was objectively hostile or abusive considering the fact that Plaintiff was humiliated by Karen Morman in person and in multiple emails contained in the ROI.

274. The Agency work environment was objectively hostile or abusive considering the fact that the record is replete with sarcastic remarks in emails contained in the ROI, (from Senior Claims Examiner Karen Morman and Supervisor Kirkham), remarks that were both unhelpful and emotionally crushing.

275. The Agency work environment was objectively hostile or abusive considering the fact that Kirkham unreasonably failed to provide emergency medical care during a seizure at work

276. The Agency work environment was objectively hostile or abusive considering the fact that Kirkham made false accusations of Ra'Shadd being AWOL after the epileptic seizure to Ra'Shadd at his desk post seizure, and in MSPB and EEOC hearings.

277. The Agency work environment was objectively hostile or abusive considering the fact that Kirkham unreasonably and improperly collected unfinished by work by Ra'Shadd and evaluated it as finished work in order to justify termination

278. The Agency work environment was objectively hostile or abusive considering the fact that Kirkham and Osterhoudt conspired to direct the preparation of and to conceal an illegal post termination performance evaluation of Plaintiff Ra'Shadd.

279. The Agency work environment was objectively hostile or abusive considering the fact that Kirkham prepared the illegal post termination performance evaluation of plaintiff.

280. In the Plaintiff's Official Personnel File (OPF) were multiple SF50s going back to 1993, all of which detailed Complainant's veteran status and his disability status.

281.  Mr. Ra'Shadd informed both the Jacksonville office and the Denver office that he needed to be seated as close as possible to the men's room due to the effect of his medications and the effects of his disabilities, including prostatitis which causes frequent urination.

282.  Jacksonville District Office Supervisor Dennis Watts testified as follows: Ra'Shadd gave Medical notice of VA Appts given supervisor (pg 35); Ra'Shadd requested and was given disability accommodation of being close to restroom due to prostatitis during training (pg 50-51, 52, 53, 54, 56, 57-58);

283.  Carmen Gaffney's EEOC testimony was that her job encompassed looking over SF50s personnel records helping fill positions (pg 82-83);

284.  The Agency had knowledge of vet status and VA appointments during work hours (pg 59).

285.  The Agency work environment was objectively hostile or abusive considering the fact that Carmen Gaffney testified that she reviewed all the documents and determined The notebook she reviewed covered less than 90 days (pg 100);

286.  Supervisor Watts testified that Ra'Shadd Informed co-workers and supervisor of disabilities (pg 90).

287.  The Agency work environment was objectively hostile or abusive considering the fact that Carmen Gaffney testified that Complainant Ra'Shadd's name was typed on top of the informal performance plan prepared and submitted by Kirkham (pg 110);

288.  Carmen Gaffney testified that all other performance evaluations she has seen in her career were signed (pg 111);

289.  Carmen Gaffney testified that all other performance evaluations were signed by the rating official (pg 111);

290.  Carmen Gaffney testified that all other performance evaluations she ever saw were signed by the reviewing official (pg 111);

291.    Carmen Gaffney testified that she saw no employee signature on the Ra'Shadd informal performance management plan (pg 111);

292.    Carmen Gaffney testified that she saw no date on the Ra'Shadd performance management plan (pg 111);

293.    Carmen Gaffney testified that she saw no rating official name on the Ra'Shadd performance management plan (pg 111-112);

294.    Carmen Gaffney testified that she saw no reviewing official name or signature on the performance management plan (pg 111-112);

295.    Carmen Gaffney testified that Performance appraisals are put in the employees electronic personnel file (pg 112-113);

296.    Carmen Gaffney testified that she reviewed Ra'Shadd's OPF and no informal performance management plan 2007 in it (pg 113);

297.    Carmen Gaffney testified that Performance management regulations do not authorize an informal performance management plan for an employee (pg 114);

298.    Carmen Gaffney testified that she never saw the informal performance evaluation on Ra'Shadd (pg 144);

299.    The Agency work environment was objectively hostile or abusive considering the fact that Carmen Gaffney testified that the informal performance evaluation performed by Kirkham on complainant Ra'Shadd violates personnel regulations and DOL requirements on appraisal

300.    The Agency work environment was objectively hostile or abusive considering the fact that this discriminatory harassment has endured from 2007 through the present date. Complainant had been subjected to a pattern of harassment by Department of Labor management for a period of more than four (4) years.

301.    The Agency work environment was objectively hostile or abusive considering the fact that the agency first failed to provide disability accommodations. Then they outright refused to install disability accommodations for Complainant. The Agency

then allowed fellow employees to tease the Complainant about his disabilities especially the head injuries, with comments like "football helmet". The agency then allowed managers to refuse to supervise the Complainant even when he specifically asked his supervisor for supervision. The same supervisor Kirkham then refused to talk to the complainant at all, instead giving him the *"silent treatment"* for the remainder of his employment with the agency. Kirkham later testified that her supervisor Osterhoudt told her specifically to not speak to Complainant, to instead write his deficiencies on paper and place the papers in his in-box.

**TWENTY THIRD CLAIM FOR RELIEF**
**AND SUPPORTING FACTUAL ALLEGATIONS**
**DEFAMATION BY LIBEL (Lyn Kirkham)**

302.    Plaintiff incorporates the preceding allegations 1 through 301 above by reference.

303.    Lyn Kirkham written publications that Plaintiff was faking a medical condition, was AWOL twice from work, and falsely claimed to her to have prostate cancer were false and defamatory.

304.    The following email transmission to multiple parties by Kirkham was false and defamatory:

> RE: Giorgio Ra'Shadd
> Cheri and Brady
>
> I had a quick staff meeting with Unit F this morning to discuss development letters and associated cases. During the meeting, Mr. Ra'Shadd acted very strange-mumbling, very little participation, and NO eye contact of any kind.
>
> In my experience with FECA, it is my strong belief today that Mr. Ra'Shadd has displayed the kind of behaviors and attitudes that we often see in stress claims-someone who is "setting the stage" so to speak. (I'm not saying he will file a claim, I'm simply bringing this up in case he does and we are asked for a statement).
>
> In addition, he was officially AWOL yesterday- having approved leave thru 1230 p.m., but did not call in or come in after 1230p.m.

305.    Lyn Kirkham publications were not privileged communications.

306.    Lyn Kirkham publications of were made negligently, with reckless disregard to their falsity, or maliciously.

307.    The statements in Kirkham's email were per se defamatory.

308.    Plaintiff has suffered special damages including loss of creditworthiness as a result of the publication of the defamatory statements.

309.    Plaintiff has suffered emotional distress as a result of the publication of the defamatory statements.

**TWENTY FOURTH CLAIM FOR RELIEF
AND SUPPORTING FACTUAL ALLEGATIONS
DISABILITY DISCRIMINATION IN
VIOLATION OF THE REHABILITATION ACT,
29 U.S.C. § 791 *et seq.,***

310.    As a further and separate cause of action, the Plaintiff repeats and realleges the allegations set forth above as if fully set forth hereafter.

311.    The employer may be found liable for discrimination as well as intentional infliction of emotional distress." Id. at 1038; See also Armbruster v. Epstein, 1996 U.S. Dist. LEXIS 7459, at *14, No. CIV. A. 96-1059, 1996 WL 289991, at *5 (E.D. Pa. May 31, 1996)

312.    Since the Plaintiff alleges discrimination based on disability in his initial EEOC charge, the Plaintiff claims and/or claimed a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq,* 42 U.S.C. §2000e-2(a)(1), 42 U.S.C. §2000e-2(a)(2), 42 U.S.C. §2000e-2(b), for a violation of 42 U.S.C. 1981, 1983, 1985, 1988 for discrimination based on sex or gender; and the retaliation set forth in the paragraphs above is also actionable under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq,* in particular 42 U.S.C. §2000e, §2000e-3, §2000e-3(a), §2000e-2(a)(1), §2000e-2(a)(2), and/or 42 U.S.C. §2000e-2(b), for discrimination based on disability.

313.     Able-bodied, non-veteran, and disabled, nonveterans co-workers were treated differently than was Plaintiff Ra'Shadd. The tort of intentional infliction of emotional distress protects the "personal interest of freedom from intentionally imposed mental anguish" and provides the remedies of compensatory and punitive damages to further that interest. Id. See also Rogers v. Loews L'Enfant Plaza Hotel, 526 F. Supp. 523, 529-31 (D.D.C. 1981).

314.     Plaintiff's claims for intentional infliction of emotional distress, and negligence and intentional misrepresentation are independent tort claims that seek to protect plaintiff's personal interests to be free from the injuries caused by the alleged tortious conduct. Plaintiff seeks compensatory and punitive damages to protect these interests.

315.     The Rehabilitation Act, 29 U.S.C. § 791 *et seq.,* prohibits the Agency from discriminating against employees on the basis of their disability. Section 794(a) provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination ... under any program or activity conducted ... by the United States." 29 U.S.C. § 794(a).

316.     Plaintiff asserts that Defendant discriminated and retaliated against him by failing to accommodate his disabilities

317.     The Rehabilitation Act, which expressly applies to federal agencies and programs receiving federal financial assistance, protects disabled employees from discrimination and requires that covered employers provide reasonable accommodations to disabled employees. See 29 U.S.C.A. §§ 791-96 (2005).

318.     The Rehabilitation Act encompasses two means of discrimination-failure to accommodate and disparate treatment. See Peebles, 354 F.3d at 765-66.

319.   Plaintiff argues that Defendant violated the Rehabilitation Act and discriminated against him in both failing to accommodate his disability and according him disparate treatment.

320.   Plaintiff was a qualified disabled worker and entitled to be Reasonably Accommodated under the Rehabilitation Act.

321.   At all times relevant, Mr. Ra'Shadd was an individual with a "disability" within the meaning of the Rehabilitation Act (29 C.F.R. § 1614.203(a)(1) (1999)) (Sections501 and 504) and within the meaning of Section 3(2) of the Americans with Disabilities Act, 42 U.S.C. § 12102(2).

322.   Section 501 of the Act requires the agency annually update "an affirmative action program plan for the hiring, placement, and advancement of individuals with disabilities ...." 29 U.S.C. §791(b). The plan must "provide [ ] sufficient assurances, procedures and commitments to provide adequate hiring, placement, and advancement opportunities for individuals with disabilities." *Id.*

323.   Section 504 of the Act declares: No otherwise qualified individual with a disability in the United States, as defined in section 705 (20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination ... under any program or activity conducted by ... the United States Postal Service. 29 U.S.C. § 794(a). "For the purposes of this section, the term 'program or activity' means all of the operations of - (1) (A) a department [or] agency, "*Id.* §794(b).

324.   Mr. Ra'Shadd has an impairment that substantially limits one or more major life activities, has a record of such impairment and is regarded by defendants as having such impairment.

325.   Mr. Ra'Shadd is an individual who has a disability because he has a physical or mental impairment (epilepsy) which substantially limits one or more major life activities, a record of such impairment, and or is regarded as having such impairment." *Mustafa v. Clark County Sch. Distr.,* 157 F.3d 1169, 1174 (9th Cir. 1998) (citing 29 C.F.R. §1630.2

(g)); *see* 29 U.S.C. §705(9)(B), (20).

326.    A "physical or mental impairment" means any "physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting" certain body systems, including musculoskeletal or respiratory systems. 29 C.F.R. §1630.2(h)

327.    The nature and severity of the Plaintiff's impairments; (ii) the duration or expected duration of the impairments; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairments. Were enhanced by the wrongful termination and disparate treatment by the agency *Id.* § 1630.2(j) (2).

328.    Mr. Ra'Shadd has shown and provided defendant with evidence of his physical impairments that are chronic, permanent and impose significant restrictions on the condition, manner, and duration under which he can perform particular activities as compared to an average, non-disabled worker. In fact, defendant considered him disabled.

329.    The courts have recognized a number of impairments as substantially limiting major life activities in specific situations. This impairment may be classified into the following four general categories of disabilities, as recognized by the National Council on Disabilities. They are (1) Disabling sensory impairments, (2) Disabling physical impairments, which include, but are not limited to: osteoarthritis, knee injury, chronic back problems, and asthma, (3) Disabling Mental or Emotional Impairments, (4) Cognitive Impairments.

330.    The plaintiff is "significantly restricted as to condition, manner or duration under which he can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j); *Toyota,* 534 U.S. at 195, 122 S.Ct. 681.

331.    Mr. Ra'Shadd has produced evidence of his disabilities to defendant numerous times from his medical providers, defendant considered her disabilities permanent, sufficiently to show that his disabilities substantially limits major life activities. Thus, he has alleged facts sufficient to make a prima facie showing that he is legally disabled and thus part of the protected group of persons eligible to claim relief under the Rehabilitation Act.

332.    The Rehabilitation Act requires federal agencies, to "reasonably accommodate an employee's disability." *McLean,* 222 F.3d at 1153. Reasonable accommodation claims are governed by the explicit terms of the Rehabilitation Act and its enacting regulations.

333.    Section 504 of the Rehabilitation Act, codified at 28 C.F.R. § 35.130(b)(7) provides that, a public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

334.    The Agency has an affirmative duty to provide "reasonable accommodations to the known physical or mental limitations of their employees." 42 U.S.C. § 12112(b)(5)(A); *see also Vinson v. Thomas, 288 F.3d 1145,* 1154 (9th Cir.2002).

335.    Ra'Shadd clearly appraised defendant management of the accommodation problems, but defendant did not act. As a result of defendant's failure to act from February 2007 to January 23, 2008, Ra'Shadd felt compelled to offer to resign if accommodations were not forthcoming. Ra'Shadd pursued his claims through the EEOC process, which agreed with Ra'Shadd that defendant had violated his rights under the Rehabilitation Act.

336.    The duty to accommodate is held to be a continuing duty that is "not exhausted by one effort." *Humphrey v. Memorial Hosps. Ass'n* (9th Cir. 2001) 239 F3d 1128, 1137.

337.    As an employee with a job related injury, (Seizure during management staff

meeting) Ra'Shadd was entitled to benefits under federal employees Compensation Act, including but not limited to, continuation of pay until a position was identified and vocational rehabilitation benefits.

**TWENTY FIFTH CLAIM FOR RELIEF**
**AND SUPPORTING FACTUAL ALLEGATIONS**
**MALICIOUS STATUTORY SLANDER**
**(Brady White)**

338.    Plaintiff incorporates the preceding allegations by reference.

339.    The inaccurate and false verbal publications by Defendant White that Plaintiff was faking a medical condition, was AWOL twice from work, and falsely claimed to her to have prostate cancer was published with malice or ill-will.

330.    Plaintiff has suffered damages as a result of this malicious slander by Defendant White.

331.    Plaintiff is entitled to actual and punitive damages have suffered damages as a result of this malicious defamation.

**TWENTY SIXTH CLAIM FOR RELIEF**
**AND SUPPORTING FACTUAL ALLEGATIONS**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Supervisory Claims Examiner Lyn Kirkham)**
**(Failure to provide emergency medical care)**

332.    Kirkham's conduct of emailing her supervisors to be prepared for a disability claim from Plaintiff due to her observations of him during the seizure instead of calling "911", constituted extreme and outrageous conduct.

333.    Kirkham's conduct of failing to provide Plaintiff emergency medical care during an epileptic seizure due to her observations of him during the seizure constituted extreme and outrageous conduct.

334.    Kirkham testified she emailed her supervisors to be prepared for a disability claim from complainant due to her observations of him during the seizure (pg 187);

335.    The MSPB sworn testimony of supervisor Kirkham was that she observed the seizure and described in in great detail in the email that she prepared and sent to the Regional director Earl Walker, but that she did not recognize it as a seizure at the time (pg 187);

336.    Kirkham testified that she did not provide emergency medical care or ask Complainant Ra'Shadd how he was because she made a determination based upon he long service with the agency that the Complainant was faking a stress claim (pg 188), and that testimony and allegation constituted extreme and outrageous conduct.

337.    Kirkham testified how her experience that federal employee's fake stress claims all the time impacted her decision not to provide emergency medical assistance to Complainant. (See Re cross exam on stress claims and staff meeting pg 200-201, and Lyn Kirkham MSPB Testimony, she observed seizure at staff meeting offered no medical care.

338.    Agency Attorney Lydia Tzagaloff helped Kirkham support that determination and rationale for not providing emergency medical care by her testimony that her experience was that federal employee's fake stress claims all the time. (See MSPB Re cross exam on stress claims and staff meeting pg 200-201),

339.    Kirkham's MSPB Testimony was that she observed seizure at staff meeting offered no medical care; she made no inquiry about his condition; she provided no supervisory assistance; yet she sat and took copious notes which she then emailed to Regional Director (pg 187);

340.    During the EEOC hearing, when faced with additional evidence, Kirkham later admitted under oath that she had completed some forms to justify removal of the complainant (pg 226).

341.    Kirkham further perjured herself when she testified that she "never observed Ra'Shadd having a seizure at work (pg 106).

342.   Kirkham was indeed Complainant's immediate supervisor at the time of the
seizure, and according to her Regional Director Mr. Walker, she had an obligation to
provide Complainant emergency medical care instead of the actions she took, referring
his seizure to the Regional Director as a potential stress claim for which the Agency
should be prepared to defend against

343.   Kirkham intentionally failed and or refused to provide plaintiff emergency
medical care during an epileptic seizure and did so with reckless disregard of the possible
consequences to Plaintiff.

344.   Kirkham conduct directly and proximately caused emotional distress to the
Plaintiff.

345.   Plaintiff has suffered damages as a result of the conduct of Lyn Kirkham.

346.   Kirkham testified in MSPB proceeding why she failed to provide emergency
medical care or call 911 during plaintiff's seizure as follows:

> HEARING PG 200-201
> Q Okay. Earlier Mr. Ra'Shadd asked you some questions concerning a staff
> meeting that you had where you thought he looked like he might be getting ready
> to file a stress claim, or something to that effect --
> A Yes.
> Q -- is that -- okay. Have you had experience with stress
> claims?
> A Yes, I have.
> Q In what capacity?
> A When I was a claims examiner on the office of Worker's Compensation in the
> Federal Employee's Compensation field – in the Federal Employee's
> compensation group I handled very complex stress claims form the U.S. Postal
> Service, from the U.S. Mint, and from other Federal Agencies. I've also taught
> Worker's Comp law to other Federal
> agencies, and part of that discussion is stress claims; what happens during the
> stress claim process.
> Q I see. Is there any sort of elevated filing of stress claims by claims examiners?
> A Claims examiners have been known to file stress claims.
>
> MSPB HEARING PG 106-107
> KIRKHAM DIRECT
> Q Okay. And did you ever have occasion to observe me having a seizure at work?
> A No.

347.    Kirkham's email concerning the Complainant's seizure that she observed is detailed and reveals her failure to provide emergency medical care to Complainant. In light of her email, Walker later testified that his expectation of the behavior of his subordinates supervisors, including Kirkham, and own behavior in case of an employee in medical distress would be different as described below: EEOC HEARING TESTIMONY, WALKER

> A.    I mean the supervisor should call 911 if they are seeing an employee having a seizure.
> Q.    Okay, do you recall seeing an e-mail from Lyn Kirkham describing Mr. Ra'Shadd's seizure during a claims meeting?
> Q.    Do you know what the term stress claim refers to?
> A.    I believe so.
> Q.    And what is that?
> A.    It is a federal employee can file an on-the-job injury claim for an occupational   disease, condition, mental disorders fall under the mental disease condition.
> Q.    And, to your knowledge, has Mr. Ra'Shadd ever filed a stress claim while working in your region?
> A.    Not to my knowledge.
> Q.    How about while he was employed in the Jacksonville office, do you have any knowledge of that?
> A.    Not to my knowledge.
> Q.    So you have no -- true or false, you have no direct knowledge of Mr. Ra'Shadd's ever filing a stress claim?
> A.    True.
> Q.    And are you familiar with epilepsy and what it is?
> A.    I have probably a lay knowledge of what epilepsy is.
> Q.    You are familiar with the word?
> A.    Yes.
> Q.    And are you familiar with -- do you know what the symptoms of epilepsy are?
> A.    I could not look at someone and determine whether or not they had epilepsy.
> Q.    What about if they were having a seizure, could you?
> A.    I wouldn't begin to guess, if somebody was having a seizure, what the cause was.
>  BY MR. LEITNER:
> Q.    But would you recognize it as being a medical problem?
> A.    I think by definition a seizure would be a medical problem.
> Q.    So if you saw somebody having a seizure in front of you, you would have assumed        that that's a medical condition?
> A.    True.
> Q.    True.  That should be treated in some fashion?

A.   As I said, anyone seeing someone having a seizure should call 911.

Q.   And if Mr. Ra'Shadd were to have a seizure today in front of you, would you alert    911, call 911?

A.   Yes.

Q.   If you had observed him having -- in medical distress during a staff meeting, would  you have alerted, called 911?

A.   You would have to define medical distress.

Q.   I am defining it as having a seizure.

A.   Then I would call 911.

Q.   And you would expect your supervisor people that are under you to do the same?

A.   As I stated, I would expect anyone in the room watching someone experience a    seizure to call 911.

Q.   That includes the supervisor?

A.   Everyone in the room.

Q.   But that's a yes?

A.   That would be a yes.

## TWENTY SEVENTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Pauline Lynch)

348.   Pauline Lynch's conduct in contradicting her sworn EEOC investigative affidavit and in changing her sworn EEOC hearing testimony multiple times during the EEOC hearing constituted extreme and outrageous conduct.

349.   Pauline Lynch's intentionally contradicted her sworn EEOC investigative affidavit, and in changing her sworn EEOC hearing testimony multiple times during the hearing, and did so with reckless disregard of the possible consequences to Plaintiff.

350.   Plaintiff has suffered damages as a result of the conduct of Pauline Lynch's. Pauline Lynch testified that as the District Operations Officer, she really did not care whether Plaintiffs' disability accommodations were put in place.

351.   Pauline Lynch testified that as the District Operations Officer she took very little actions to ensure that the required disability accommodation equipment was put in place for Plaintiff because she was busy travelling doing other agency recruitment which had a higher priority.

352. This caused undue stress and emotional pain to Complainant and trigger increased seizures.

### TWENTY EIGHTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Lydia Tzagaloff)

353. Plaintiff filed his law suit on September 24, 2012, well within the requirements of law. The Third Circuit has held that the parameters of a civil action by a private litigant are "defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the [EEOC]." Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1977). See also Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984); Newton v. United States Recycling, Inc., 2001 U.S. Dist. LEXIS 195, Civ. A. No. 00- CV-5466, 2001 WL 33707, at *1 (E.D. Pa. Jan. 11, 2001).

354. The actions (Rule 11 violations during MSPB and EEOC hearings and Fraud on the Court during both hearings), of Defendant Tzagaloff constitutes Intentional Infliction of Emotional Distress.

355. As a direct and proximate result of the Intentional Infliction of Emotional Distress by Defendant, the Plaintiff has suffered injuries and suffered pecuniary damages in an amount to be proven at the trial of this matter.

### TWENTY NINTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### District Director Brady White
### (False Prostate cancer allegation)

356. Brady White's conduct in falsely alleging that Plaintiff claimed to have prostate cancer defamed the good name and credit of Plaintiff constituted extreme and outrageous conduct.

357.   Mr. Ra'Shadd informed both the Jacksonville office and the Denver office that he needed to be seated as close as possible to the men's room due to the effect of his medications and the effects of his disabilities, including prostatitis which causes frequent urination.  See the testimony of Jacksonville District Office Supervisor Dennis Watts below: Ra'Shadd gave Medical notice of VA Appts given supervisor (pg 35); Ra'Shadd requested and was given disability accommodation of being close to restroom; due to prostatitis during training (pg 50-51, 52, 53, 54, 56, 57-58); The Agency had knowledge of vet status and VA appointments during work hours (pg 59); Ra'Shadd Informed co-workers and supervisor of disabilities (pg 90);

358.   Brady White's intentionally defamed the good name and credit of the Plaintiff, and did so with reckless disregard of the possible consequences to Plaintiff.

359.   Brady White's conduct in defaming the good name and credit of Plaintiff directly and proximately caused emotional distress to the Plaintiff.

360.   Plaintiff has suffered damages as a result of the conduct of Brady White.

### THITHIETH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGENCY)

361.   Supervisory Claims Examiner Kirkham admitted that she would violate federal law instead of complying with it if her immediate supervisor instructed her to do so (pg 125-126);

362.   Kirkham admitted that she had filled out forms in order to justify the removal of the complainant from his job (pg 226);

363.   Kirkham testified that she intentionally ignored the instructions of her immediate supervisor Cheryl Osterhoudt that she was to look in his desk find personal items, including typing assistance tools and personal medications to relieve pain caused by his disabilities, and to move the appropriate place because she did not have time to go through desk and determine what was personal (pg 231).

364. Kirkham further testified that she recalls Osterhoudt telling her to go to the complainant's desk and retrieve his personal items, but that she decided that she did not want to, and specifically because she did not have time (pg 232).

365. Kirkham's EEOC Hearing Testimony included her assertions that on the 18th Jan 2008, she told Ra'Shadd that he was AWOL, and that he needed to watch it (pg194);

366. Kirkham testified in the EEOC hearing that her prior testimony was truthful (pg 203);

367. Kirkham admitted to discrepancy in her EEOC sworn affidavit testimony and she apologized to the EEOC judge (pg205);

368. Kirkham testified that she may have taken incomplete work off his desk to review (pg 212);

369. Kirkham testified that she did not get instruction on what to do when an employee requests disability accommodation because there was no supervisory training given to her between May and November 2007 (pg 219);

370. Kirkham testified that she received training in January 2009, a year after his termination (pg 220).

371. Kirkham testified that she is not responsible for that notification because the Nov 13, 2007 2:33pm email notification from Ronnie Sanchez to her Subject: Follow up Ra'Shadd special equipment is one of hundreds of emails per day that she receives and that the particular email may have been lost (pg 98).

372. Sanchez testified during the EEOC hearing in contradiction to his own testimony at the MSPB Hearing and his own EEOC sworn affidavit.

373. Sanchez testified during the EEOC hearing it was never communicated to him what the disability accommodation equipment was for (pg 130);

374. Sanchez testified during the EEOC hearing He admits perjury at MSPB hearing and earlier EEOC hearing testimony, and apologizes to the court (pg 131);

## THIRTY FIRST CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Cheri Osterhoudt)
### (False Allegation of claim of prostate cancer)

375.    Cheri Osterhoudt's conduct in her sworn testimony during the EEOC hearing that Plaintiff claimed to her to have prostate cancer was false and defamatory.

376.    Mr. Ra'Shadd informed both the Jacksonville office and the Denver office that he needed to be seated as close as possible to the men's room due to the effect of his medications and the effects of his disabilities, including prostatitis which causes frequent urination. See the testimony of Jacksonville District Office Supervisor Dennis Watts below: Ra'Shadd gave Medical notice of VA Appts given supervisor (pg 35); Ra'Shadd requested and was given disability accommodation of being close to restroom due to prostatitis during training (pg 50-51, 52, 53, 54, 56, 57-58); The Agency had knowledge of vet status and VA appointments during work hours (pg 59); Ra'Shadd Informed co-workers and supervisor of disabilities (pg 90);

377.    Osterhoudt intentionally defamed the good name and credit of the Plaintiff, and did so with reckless disregard of the possible consequences to Plaintiff.

378.    Osterhoudt's conduct in defaming the good name and credit of Plaintiff constituted extreme and outrageous conduct.

379.    Osterhoudt's intentionally defamed the good name and credit of the Plaintiff, and did so with reckless disregard of the possible consequences to Plaintiff.

380.    Osterhoudt's conduct in defaming the good name and credit of Plaintiff directly and proximately caused emotional distress to the Plaintiff.

381.    Plaintiff has suffered damages as a result of the conduct of Osterhoudt.

## THIRTY SECOND CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Cheri Osterhoudt)
### (Conspiracy to produce and conceal a post termination performance evaluation
### Of Plaintiff in violation of federal law)

382.    Cheri Osterhoudt's conduct in conspiring with Lyn Kirkham to produce and conceal a post termination performance evaluation of Plaintiff in violation of federal law constituted extreme and outrageous conduct.

383.    Kirkham testified during the EEOC and MSPB hearings that she prepared an unofficial performance evaluation/interim performance appraisal as a matter of record; and that Complainant's performance appraisal was an unofficial performance evaluation/ Interim performance appraisal and it was not provided to him.

384.    Cheri Osterhoudt's intentionally conspired with Lyn Kirkham to produce and conceal a post termination performance evaluation of Plaintiff in violation of federal law, and did so with reckless disregard of the possible consequences to Plaintiff.

385.    Cheri Osterhoudt's conduct in conspiring with Lyn Kirkham to produce and conceal a post termination performance evaluation of Plaintiff in violation of federal law directly and proximately caused emotional distress to the Plaintiff.

386.    Kirkham testified that she talked to her supervisor Sheri Osterhoudt and Osterhoudt told her to prepare an interim appraisal (pg 178);

387.    Kirkham testified that she was not asked to prepare an interim appraisal for anyone but Mr. Ra'Shadd (pg 180);

388.    Kirkham testified that her purpose of preparing unofficial performance evaluation/interim appraisal was that Ms. Osterhoudt, the supervisor requests it (pg 184);

389.    Kirkham testified that she never served the unofficial performance evaluation/interim appraisal on Ra'Shadd (pg 184);

390. Kirkham testified that the illegal performance evaluation she conducted of the Plaintiff was one she performed because she was told by her boss to do so, but that she never received training on how prepare an unofficial performance evaluation/interim appraisal (pg 239,246).

391. Kirkham later admitted in her testimony that there is no such thing as training to prepare an unofficial performance evaluation/interim appraisal (pg 240).

392. Kirkham also admitted in her testimony that no supervisor asked her to do an unofficial performance evaluation/interim appraisal from Nov 2007 through Jan 23, 2008 on anyone except the Plaintiff (pg 240);

393. Kirkham testified that no one asked her to do a unofficial performance evaluation/interim appraisal of any other employee before the Plaintiff served in her unit or after he was terminated  from her unit (pg 241);

399. Kirkham testified that Mr. White and Ms. Osterhoudt never asked her to do another unofficial performance evaluation/interim appraisal (pg 242);

400. Kirkham testified that she gave the unofficial performance evaluation/interim appraisal to Assistant District Director Osterhoudt in a claims examiner data notebook (pg 247); and that the Notebook was sent forward to Regional Director Walker by Assistant Director Osterhoudt (pg 247).

401. Plaintiff has suffered damages as a result of the conduct of Cheri Osterhoudt in conspiracy with Lyn Kirkham.

**THIRTY THIRD CLAIM FOR RELIEF
AND SUPPORTING FACTUAL ALLEGATIONS
NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
Cheri Osterhoudt**

402. The Agency hid the disability accommodation equipment of plaintiff, which they retrieved from his desk and drawers, in the office of the Assistant District Director, Sherri Osterhoudt.

403.    Osterhoudt testified that the equipment and personal effects were placed behind a table in her desk, her desk was locked.

404.    Osterhoudt retired with plaintiff's disability equipment and medications locked in her office.

405.    Plaintiff was denied access to personal accommodation equipment, army accommodation equipment, and VA hospital provided accommodation equipment, from January 23, 2008 to the present date, a period of 4 years.

406.    Kirkham again perjured herself during the EEOC hearing testimony when she testified that Assistant District Director Osterhoudt never told her the disability equipment had come in and she was handling it (pg 249).

407.    Sanchez reversed his MSPB testimony when he testified before the EEOC judge that he informed Kirkham of plaintiff's disability, disability equipment and the fact that it was not installed yet.

408.    Plaintiff has suffered damages as a result of the conduct of Cheri Osterhoudt in conspiracy with Lyn Kirkham.

**THIRTY FOURTH CLAIM FOR RELIEF
AND SUPPORTING FACTUAL ALLEGATIONS
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Kirkham)**

409.    Kirkham testified first that she is not responsible for that notification because the Nov 13, 2007 2:33pm email notification from Ronnie Sanchez to her "Subject: Follow up Ra'Shadd special equipment" is one of hundreds of emails per day that she receives and that the particular email may have been lost (pg 98).

410.    Kirkham further perjured herself when she testified that she "never observed Ra'Shadd having a seizure at work (pg 106).

411.    In her own email that she forwarded to the Regional director described Complainant's seizure in great detail, and Kirkham failed to offer emergency medical assistance during or after Complainant's seizure.

412.    Walker later testified that his expectation of the behavior of his subordinates supervisors, including Kirkham, and own behavior in case of an employee in medical distress would be different as described below: EEOC HEARING TESTIMONY, WALKER

> A.    I mean the supervisor should call 911 if they are seeing an employee having a seizure.
> Q.    Do you know what the term stress claim refers to?
> A.    I believe so.
> Q.    And what is that?
> A.    It is a federal employee can file an on-the-job injury claim for an occupational    disease, condition, mental disorders fall under the mental disease condition.
> Q.    And, to your knowledge, has Mr. Ra'Shadd ever filed a stress claim while working in your region?
> A.    Not to my knowledge.
> Q.    How about while he was employed in the Jacksonville office, do you have any knowledge of that?
> A.    Not to my knowledge.
> Q.    So you have no -- true or false, you have no direct knowledge of Mr. Ra'Shadd's ever filing a stress claim?
> A.    True.
> Q.    And are you familiar with epilepsy and what it is?
> A.    I have probably a lay knowledge of  what epilepsy is.
> Q.    You are familiar with the word?
> A.    Yes.
> Q.    And are you familiar with -- do you know what the symptoms of epilepsy are?
> A.    I could not look at someone and determine whether or not they had epilepsy.
> Q.    What about if they were having a seizure, could you?
> A.    I wouldn't begin to guess, if somebody was having a seizure, what the cause was.
> BY MR. LEITNER:
> Q.    But would you recognize it as being a medical problem?
> A.    I think by definition a seizure would be a medical problem.
> Q.    So if you saw somebody having a seizure in front of you, you would have assumed that that's a medical condition?
> A.    True.
> Q.    True.  That should be treated in some fashion?
> A.    As I said, anyone seeing someone having a seizure should call 911.

Q.   And if Mr. Ra'Shadd were to have a seizure today in front of you, would you alert 911, call 911?

A.   Yes.

Q.   If you had observed him having -- in medical distress during a staff meeting, would  you have alerted, called 911?

A.   You would have to define medical distress.

Q.   I am defining it as having a seizure.

A.   Then I would call 911.

Q.   And you would expect your supervisor people that are under you to do the same?

A.   As I stated, I would expect anyone in the room watching someone experience a    seizure to call 911.

Q.   That includes the supervisor?

A.   Everyone in the room.

Q.   But that's a yes?

A.   That would be a yes.

## THIRTY FIFTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Kirkham)

413.   Kirkham testified first that she is not responsible for that notification because the Nov 13, 2007 2:33pm email notification from Ronnie Sanchez to her "Subject: Follow up Ra'Shadd special equipment" is one of hundreds of emails per day that she receives and that the particular email may have been lost (pg 98).

414.   Kirkham further perjured herself when she testified that she "never observed Ra'Shadd having a seizure at work (pg 106).

415.   Walker later testified that his expectation of the behavior of his subordinates supervisors, including Kirkham, and own behavior in case of an employee in medical distress would be different as described below: EEOC HEARING TESTIMONY, WALKER

A.    I mean the supervisor should call 911 if they are seeing an employee having a seizure.

Q.   Do you know what the term stress claim refers to?

A.   I believe so.

Q.   And what is that?

A.    It is a federal employee can file an on-the-job injury claim for an occupational   disease, condition, mental disorders fall under the mental disease condition.

Q.    And, to your knowledge, has Mr. Ra'Shadd ever filed a stress claim while working in your region?

A.    Not to my knowledge.

Q.    How about while he was employed in the Jacksonville office, do you have any knowledge of that?

A.    Not to my knowledge.

Q.    So you have no -- true or false, you have no direct knowledge of Mr. Ra'Shadd's ever filing a stress claim?

A.    True.

Q.    And are you familiar with epilepsy and what it is?

A.    I have probably a lay knowledge of  what epilepsy is.

Q.    You are familiar with the word?

A.    Yes.

Q.    And are you familiar with -- do you know what the symptoms of epilepsy are?

A.    I could not look at someone and determine whether or not they had epilepsy.

Q.    What about if they were having a seizure, could you?

A.    I wouldn't begin to guess, if somebody was having a seizure, what the cause was.

        BY MR. LEITNER:

Q.    But would you recognize it as being a medical problem?

A.    I think by definition a seizure would be a medical problem.

Q.    So if you saw somebody having a seizure in front of you, you would have assumed that that's a medical condition?

A.    True.

Q.    True.  That should be treated in some fashion?

A.    As I said, anyone seeing someone having a seizure should call 911.

Q.    And if Mr. Ra'Shadd were to have a seizure today in front of you, would you alert    911, call 911?

A.    Yes.

Q.    If you had observed him having -- in medical distress during a staff meeting, would  you  have alerted, called 911?

A.    You would have to define medical distress.

Q.    I am defining it as having a seizure.

A.    Then I would call 911.

Q.    And you would expect your supervisor people that are under you to do the same?

A.    As I stated, I would expect anyone in the room watching someone experience a    seizure to call 911.

Q.    That includes the supervisor?

A.    Everyone in the room.

Q.    But that's a yes?

A.    That would be a yes.

# THIRTY SIXTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
## RETALIATION UNDER THE REHABILITATION ACT OF 1973,
## AS AMENDED; TITLE VII and 42 U.S.C. § 1981.

416.     Plaintiff Ra'Shadd (1) was engaged in protected opposition to failure to accommodate his disabilities and instituted EEO activities as well as participated in a Title VII proceeding;

417.     Defendant took adverse action against Plaintiff subsequently to or contemporaneously with Plaintiff's protected activity;

418.     A causal connection exists between Plaintiff's activity and the Defendant's action. Mattioda, 323 F.3d at 1293 (citing Love v. Re/Max of America, Inc., 738 F.2d 383, 385 [10th Cir.1984]).

419.     A causal connection is demonstrated by the Plaintiff's evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir.1982).

420.     Additional Plaintiff evidence beyond temporal proximity also establishes causation." Meiners, 359 F.3d at 1231 (citation omitted).

421.     Title 42 United States Code section 12203(a), which applies to cases brought under the Rehabilitation Act by the express terms of Title 29 United States Code section 791(g), provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C.A. § 12203(a) (2005); 29 U.S.C.A. § 791(g) (2005).

422.     Plaintiff Ra'Shadd is an employee who opposed disability discrimination by filing a complaint with the agency responsible for investigating such complaints for activity protected by the Rehabilitation Act. See Williams v. O'Neill, 23 Fed. Appx. 738, 740 (9th Cir.2001).

423.    Plaintiff engaged in protected opposition under the Rehabilitation Act;

424.    Defendant took an adverse employment action against Plaintiff;

425.    A causal connection exists between the protected opposition and the adverse action. See Humbles v. Principi, 141 Fed. Appx. 709, 713 (10th Cir.2005); Sherman v. Runyon, 235 F.3d 406, 410 (8th Cir.2000); Carter v. Ball, 33 F.3d 450, 460 (4th Cir.1994).

426.    The Agency terminated Plaintiff Ra'Shadd for the purpose of retaliation." ' Humbles v. Principi, 141 Fed. Appx. 709, 713 (citing Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1320-21 [10th Cir.1999]).

427.    Upon information and belief, at all times relevant hereto, (due to the willful and unlawful discrimination, harassment, retaliation and/or unfair treatment committed by the Defendant(s), their agents, servants, and/or employees, and/or the conduct of the Defendant(s) which was done in an effort to force the Plaintiff to resign, and/or the Defendant(s)' intentional or, in the alternative, negligent infliction of emotional distress on the Plaintiff), the Plaintiff has suffered adverse employment action(s), suffers past and future loss of income, retirement and other fringe benefits, loss of career advancement and/or restriction of promotional opportunities and advancement, wrongful termination, intentional and/or negligent infliction of emotional distress, mental anguish and humiliation, and/or damages; and there is a causal connection between the violations set forth above and the damages.

428.    Mr. Ra'Shadd  was engaged in protected conduct of requesting disability accommodations when he was terminated;

429.    Mr. Ra'Shadd was subjected to a materially adverse employment actions of harassment, and failure to accommodate;

430.    There is a causal connection between the protected conduct and the adverse action. See Proctor v. United Parcel Service, 502 F.3d 1200, 1208 (10th Cir.2007).

431.    The termination occurred within a week of the last time plaintiff requested disability accommodations, so the adverse action followed shortly after the protected activity. See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir.1999).

432.    As to the alleged adverse employment actions, there is evidence of a causal connection between the adverse action (termination) and the protected activity.

433.    Under Title VII, it is unlawful " 'for an the DOL (Agency) to discriminate against Plaintiff Ra'Shadd, one of its employees, because Plaintiff Ra'Shadd has opposed any practice made an unlawful employment practice by Title VII, or because Plaintiff Ra'Shadd has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." ' Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 269, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (quoting 42 U.S.C. § 2000e-3[a] ).

434.    Defendant violated Title VII and retaliated against Plaintiff by terminating plaintiff and by issuing him a notice of removal.

435.    Mr. Ra'Shadd also alleges that he was retaliated against for having engaged in prior EEO activity, in violation of both Title VII and 42 U.S.C. § 1981.

436.    Regional Director Walker testified that Kirkham terminated Ra'Shadd and he concurred with the termination.

437.    Kirkham knew of his prior protected activity, and Kirkham had the responsibility to forward such information to the final decision maker, Walker, according to the testimony of Walker. *Hinds v. Sprint/United Management Co.,* 523 F.3d 1187, 1203 (10th Cir.2008).

## THIRTY SEVENTH CLAIM FOR RELIEF
### DAMAGES

438.    Plaintiff adopts and incorporates herein by reference the allegations made in paragraphs 1 through 524 above.

439.    As a proximate result of the Defendants' negligence; retaliation; disability discrimination; failure to accommodate; conspiracy; negligence per se; fraud on the court; gross negligence; intentional infliction of emotional distress; negligent infliction of emotional distress; negligent supervision; and negligent training, the Plaintiff, Giorgio DeShaun Ra'Shadd, sustained the following damages and other injuries to be proven at trial.

  A. Past, present and future severe, permanent and disabling injuries;

  B. Past, present and future physical pain and suffering;

  C. Past, present and future mental and emotional anguish;

  D. Past, present and future loss of wages and wage earning capacity;

  E. Past, present and future doctor, hospital, drug and medical expenses;

  F. Increased and enhanced epileptic seizures and intensive migraines;

  G. Increased and enhanced physical pain and suffering;

  H. Increased and enhanced mental and emotional anguish;

## REQUEST FOR RELIEF

440.    Plaintiff requests the following relief:

A. Declare the Defendant(s) conduct to be in violation of law and of the Plaintiff's rights;

B. Enjoin the Defendant(s) from engaging in such conduct;

C. Award the Plaintiff compensatory damages including but not limited to emotional distress, mental anguish and humiliation in the sum of $750,000;

D. Award the Plaintiff liquidated damages in an amount to be determined by the Court for lost past and future income and other losses;

E. Award the Plaintiff costs, backpay, expert witness fees and attorney's fees, to be determined; and

F. That Plaintiffs be granted an award for suffering Libel and Slander and Defamation,

G. That Plaintiffs be granted an award for suffering a violation of civil rights

H. Order Defendant Employer to institute and carry out policies, practices and programs which provide equal employment opportunities for its disabled veteran

employees, and which eradicate the effects of its past and present unlawful employment practices.

I.    That judgment be entered for Plaintiff against Defendants for three times the amount of damages sustained by Plaintiff as allowed by law.

J.    That Plaintiff recovers damages, as provided by federal and state laws, and that a judgment be entered in favor of Plaintiff against defendants, jointly and severally, in an amount to be trebled in accordance with such laws;

K.    That Plaintiff recovers damages and/or all other available monetary and equitable remedies under the laws identified above;

L.    That Plaintiff be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

M.    That Plaintiff be awarded Punitive damages.

N.    Grant such other and further relief as to this Court may deem just and proper. for entry of judgment against the Defendants, for knowingly and intentionally entering into fraud upon the Court in the proceedings in the MSPB and in the EEOC.


Respectfully Submitted

Date: 11|21|12

Giorgio DeShaun Ra'Shadd, Pro Se

G R
(Plaintiff=s Original Signature)

PO Box 47514

(Street Address)

Saint Petersburg, Florida, 33743

(City, State, ZIP)

515-664-2541

(Telephone Number)

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to

each of the following:


United States Department of Justice
U.S. Attorney John F. Walsh
Main Office 1225 17th Street Suite 700,
Denver, CO 80202.

Agency Representative
U.S. Mail Lydia A. Tzagaloff, Esq.
Department of Labor
Office of the Solicitor
1999 Broadway, Suite 1600
P.O. Box 46550
Denver, CO 80201-6550


_____
By: Giorgio DeShaun Ra'Shadd